887 A.2d 564

Erik **STODDARD**

v.

**STATE of Maryland.**

**No. 70 Sept. Term, 2004.**

Court of Appeals of Maryland.

Dec. 8, 2005.

Eve L. Brensike, Assistant Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for petitioner.

Sarah Page Pritzlaff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

RAKER, J.

Erik Stoddard was convicted of second degree murder and child abuse resulting in death. The primary question we must answer in this case is whether the trial court erred in admitting testimony recounting an out-of-court utterance allegedly made by a non-testifying eighteen month old child to the effect of "is Erik going to get me?" The State offered this utterance as evidence that the child had witnessed Stoddard commit the murder. The case requires us to consider the evidentiary question of whether the unintended implications of speech—a particular class of "implied assertions"—may be hearsay. Both the trial court and the Court of Special Appeals ruled that this evidence was not hearsay. We disagree and reverse the judgments.

## I.

Three-year-old Calen DiRubbo died on the evening of June 15, 2002. The Grand Jury for Baltimore City indicted Stoddard for the offenses of first degree murder, second degree murder, and child abuse resulting in death. He was convicted by a jury of second degree murder and child abuse resulting in death and acquitted of first degree murder. The court sentenced him to a term of thirty years incarceration for each offense, to be served consecutively.

At trial, Deputy Chief Medical Examiner Mary Ripple testified that she had performed an autopsy on Calen, and had determined the cause of death to be multiple blunt force injuries. Foremost among these injuries was a severed bowel,

an injury typically associated with the infliction of "a tremendous amount of force" to the abdomen. Based on laboratory results, Dr. Ripple placed the time of Calen's death between 8:30 and 10:30 p.m., and placed the time of the fatal injury between four and sixteen hours prior to death. On cross-examination, Dr. Ripple admitted that this range was only an estimate, and that the trauma conceivably could have occurred up to twenty-four hours prior to death.

According to this medical opinion, Calen received the fatal blow between 4:00 a.m. and 6:30 p.m. on June 15th, or, at the very earliest, sometime after 8:30 p.m. on June 14th. The evidence suggested that, for at least part of this period, Stoddard was the only adult supervising Calen, her older brother Nicholas Jr., and her cousin Jasmine Pritchett, then eighteen months of age.

The central issue in this case arose during the testimony of Jasmine Pritchett's mother Jennifer Pritchett. The prosecutor asked Jennifer Pritchett, "Since that day, since Saturday June 15th have you noticed any behavioral changes in Jasmine?" Defense counsel objected, and the prosecutor explained to the court:

"I have to prove time frame and I have to prove when the violence occurred, and it obviously happened when this little girl was there. If she's fine when she goes home and nothing happens, then there is a good defense argument that nothing happened during that time period."

The court replied, "You can get the mother to testify as to what the behavior was before and after ... I don't even want you to ask her if she's discussed it with her. You can ask her about the differences in the behavior."

Despite this ruling by the court, the following exchange then took place:

"[STATE'S ATTORNEY:] Ma'am, have you noticed any behavioral changes in Jasmine since Saturday June 15th?

[JENNIFER PRITCHETT:] Yes, I have.

[STATE'S ATTORNEY:] And would you describe just the behavioral changes for the jury, please?

[JENNIFER PRITCHETT:] Jasmine has become—

THE COURT: Keep your voice up.

[JENNIFER PRITCHETT:] Jasmine is very petrified of any strangers introduced to her or if there is any form of loud noise, yelling, anything, she has gotten so upset that she's broken out in hives. She has nightmares and screaming fits.

[STATE'S ATTORNEY:] Have you ever seen any of these behaviors prior to June 15th?

[JENNIFER PRITCHETT:] No.

[STATE'S ATTORNEY:] Has she ever—you have never discussed this case with her, have you?

[JENNIFER PRITCHETT:] No.

[DEFENSE COUNSEL]: Object.

THE COURT: Overruled.

[STATE'S ATTORNEY:] And—

[JENNIFER PRITCHETT:] No, I have not.

[STATE'S ATTORNEY:] And has she ever—has she ever asked you any questions about it?

[JENNIFER PRITCHETT:] She asked me if Erik was going to—

[DEFENSE COUNSEL]: Object.

THE COURT: No, I'm going to overrule it.

[STATE'S ATTORNEY:] Go ahead, ma'am.

[JENNIFER PRITCHETT:] She asked me if Erik was going to get her."

The following colloquy then took place at the bench:

"[DEFENSE COUNSEL]: Your Honor, not only is that hearsay, but its reliability is tenuous at best. This is far beyond what I believe was the Court's discretion. I'm going to move for a mistrial at this juncture.

[STATE'S ATTORNEY:] May I be heard?

THE COURT: I'll hear you.

[STATE'S ATTORNEY:] First off, it's not hearsay. It's a question. The child asked a question and by simply in terms of its form, it can't be hearsay. Secondly, it's—it's not—hearsay isn't a question. Hearsay is a statement offered for its truth of the matter asserted. I am not trying to argue

that Erik is going to get her.  What it does show is the child's fear—

THE COURT: [E]ffects on her, overruled.

[STATE'S ATTORNEY:]  Exactly.

THE COURT: Denied.

[DEFENSE COUNSEL]: Thank you.  And my motion for mistrial, Your Honor?

THE COURT: Denied."

During the State's closing argument, the prosecutor referred to this evidence as follows:

"And I'm sure you're thinking, 'It's too bad there wasn't an eyewitness.  It's a real pity someone didn't see him do this.

\* \* \*

But you know something?  There was an eyewitness in this case.  Unfortunately, she's just too young to come into court and testify, and that eyewitness was Jasmine, Jennifer's child.  Do you remember when Jennifer testified?  She said that starting on June 15th, her little girl, Jasmine, had an abrupt personality change.  All of a sudden, out of the blue, little Jasmine started to have nightmares.  She started to have behavioral problems and she started to ask her mother, 'Is Erik going to get me?'  'Is Erik going to get me?'

Now, you heard Jennifer testify.  Jasmine was two years old.  There was no way she discussed the events of Calen's murder with Jasmine.  You know they're not going to discuss this in front of a two-year-old child and she's not going to tell Jasmine anything about this, but Jasmine asked her, 'Is Erik going to get me?'  Why? She was afraid of Erik. She didn't ask, 'Is Nick going to get me?'  She didn't ask, 'Is Mark going to get me?'  She wasn't afraid of them.  She was afraid of Erik. Why? Because she saw.  She was the eyewitness.  She saw what happened to Calen that day and she was scared to death it was going to happen to her, too."

Stoddard was convicted and noted a timely appeal to the Court of Special Appeals.  Before that court, Stoddard ar-

gued, *inter alia*, that Jasmine Pritchett's out-of-court question, "Is Erik going to get me," was hearsay when offered to prove the truth of its "implied assertion" that Jasmine was afraid of Erik Stoddard. The State argued that Jasmine's question was not hearsay because it was simply a request for information, spoken without the intent to "assert" anything, and hence not an "assertion" for purposes of Md. Rule 5–801(a). Alternatively, the State argued that even if Jasmine's question contained an implied assertion, that assertion was "Eric is going to get me," and her words were not offered to prove that Eric was in fact going to "get" Jasmine, but rather as circumstantial evidence of her state of mind. The State also argued that any error in admitting the evidence was harmless.

The Court of Special Appeals affirmed. *Stoddard v. State*, 157 Md.App. 247, 850 A.2d 406 (2004). Tracing the history of the implied assertion doctrine from the noted English case of *Wright v. Doe d. Tatham*, 112 Eng. Rep. 488 (Exch. Ch. 1837) and 47 Rev. Rep. 136 (H.L.1838), the Court of Special Appeals held that Jasmine's question is a "non-assertive verbal utterance," and is not hearsay. *Id.* at 279, 850 A.2d at 424.

We granted Stoddard's petition for a writ of certiorari to consider the following question:

"Did the Court of Special Appeals, purporting to overrule this Court's longstanding precedent and drastically narrowing the scope of Maryland's hearsay rule so as to remove virtually all implied assertions from the definition of hearsay, err in holding that an out-of-court statement by a non-testifying eighteen-month-old child in which the child implied that she was afraid of Petitioner because she saw him beat the victim was not an implied assertion under Maryland Rule 5–801?"

*Stoddard v. State*, 383 Md. 211, 857 A.2d 1129 (2004).

## II.

Before this Court, Stoddard argues that Maryland has retained, and should retain, the common law view of implied

assertions as expressed in *Wright v. Tatham,* at least as applied to words rather than nonverbal conduct. He argues that Jasmine's question was offered for the truth of a matter impliedly asserted—namely, that Jasmine was afraid of Stoddard *because she had seen Stoddard assault Calen*—and thus inadmissible hearsay under the *Wright v. Tatham* approach.

The State argues that the evidence was not hearsay under Md. Rule 5–801. First, the State maintains that Rule 5–801 rejected the holding of *Wright v. Tatum* and that, since the adoption of the Rule, that case no longer defines an assertion for purposes of hearsay in Maryland. Specifically, the State argues that the implications of an utterance now constitute assertions only if the declarant *intended* to communicate those implications. It is most unlikely that Jasmine intended to communicate any implied message through her question, the State continues, and therefore neither the question nor any implication of the question qualifies as an assertion. Finally, the State contends that any error was harmless beyond a reasonable doubt.

This case presents one facet of the classic "implied assertion" hearsay puzzle. We must decide whether out-of-court words are hearsay when offered to prove the truth of a factual proposition communicated unintentionally by the declarant.

In Maryland, the admission of evidence is committed ordinarily to the sound discretion of the trial judge. *See Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432, 439 (1997). Hearsay is different. Under Md. Rule 5–802, "[e]xcept as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." In other words, the judge has no discretion to admit hearsay unless it falls within a constitutional, statutory or rule exception.

Maryland Rule 5–801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The threshold questions when a hearsay objection is raised are (1) whether the declaration at issue is a

"statement," and (2) whether it is offered for the truth of the matter asserted. If the declaration is not a statement, or if it is not offered for the truth of the matter asserted, it is not hearsay and it will not be excluded under the hearsay rule.

"Statement" is defined by Md. Rule 5–801(a) as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." The Rule does not define "asserted" or "assertion." The Committee note to Rule 5–801 explains as follows:

> "This Rule does not attempt to define 'assertion,' a concept best left to development in the case law. The fact that proffered evidence is in the form of a question or something other than a narrative statement, however, does not necessarily preclude its being an assertion. The Rule also does not attempt to define when an assertion, such as a verbal act, is offered for something other than its truth."

Much verbal evidence may be sorted into hearsay and non-hearsay without too searching an inquiry into the definitions at issue. In a simpler case, Jasmine would have said "I saw Erik hit Calen," and these words would be hearsay if offered through Jennifer Pritchett to prove that Jasmine had in fact seen Erik hit Calen. Or, had the words "is Erik going to get me" been offered through Jennifer to prove that Jasmine was alive, or knew how to speak English, or could speak at all at the time she spoke them, they would be non-hearsay.

In the instant case, the utterances of Jasmine were not offered for the "truth" of the words "Is Erik going to get me?" Nor was Jasmine's mere act of speaking the words relevant in and of itself. Rather, the State offered the words as evidence of a fact the State sought to prove, *i.e.*, that Jasmine had witnessed Erik assault Calen DiRubbo. The words in and of themselves contain no information about an assault or about someone named Calen. The implied assertion doctrine arises in this case because Jasmine's question is relevant only in that, by asking it, Jasmine may have revealed, by implication, a belief that she had witnessed Erik assaulting Calen. The question before us is whether these words are hearsay when offered to prove the truth of that belief.

Contrary to the State's contention, the words are not relevant if offered merely to prove that Jasmine was afraid of Stoddard. Jasmine's fear of Stoddard is irrelevant unless it stems from a belief that she had seen Stoddard assault Calen. Although it is conceivable that Jasmine's fear, taken together with her presence during the relevant time frame, was circumstantial evidence that Jasmine witnessed Stoddard assault Calen,[1] this conceptualization is a distinction without a difference. Jasmine's fear of Stoddard is relevant only if it is rational, *i.e.*, only if it stems from a real-world condition or event. To rationally fear Erik Stoddard is to believe the proposition "I have a reason to fear Erik Stoddard." Jasmine's belief in this proposition is relevant only if the "reason" at issue is her having witnessed Erik assaulting Calen. Thus, in offering Jasmine's fear as evidence, the State implicitly would be offering Jasmine's belief in the proposition "I have a reason to fear Erik Stoddard and that reason is that I saw him assault Calen."

## III.

A. *Wright v. Tatham* and the Implied Assertions Doctrine

The implied assertions doctrine focuses on the implications or inferences contained within or drawn from an utterance, as distinguished from the declaration's literal contents. The

---

1. For a discussion of the mischaracterization of hearsay statements as non-hearsay "circumstantial evidence" of the underlying proposition, *see* Roger C. Park, McCormick on Evidence *and the Concept of Hearsay: A Critical Analysis Followed by Suggestions to Law Teachers*, 65 Minn. L.Rev. 423, 430 (1981). *See also* Ronald J. Bacigal, *Implied Hearsay: Defusing the Battle Line Between Pragmatism and Theory*, 11 S. Ill. U. L.J. 1127, 1140 (1987) (dying victim's statement "I love you" to homicide defendant would be irrelevant if offered to prove merely that victim loved defendant; victim's love for defendant only relevant if reveals belief in defendant's innocence; thus hearsay when offered to prove defendant's innocence). *But see Church v. Commonwealth*, 230 Va. 208, 335 S.E.2d 823 (1985) (admitting child's out-of-court statement that sex was "dirty, nasty, and it hurt" as non-hearsay on grounds that it was offered merely to prove child's "attitude toward sex," which was circumstantial evidence that she had been molested by defendant). *See also* Bacigal, *supra*, at 1141–44 (refuting logic of *Church* ).

evidentiary treatment of implied assertions has been the subject of legal debate and controversy for many years, and has been addressed often since the adoption of the Federal Rules of Evidence. Courts around the country are split as to how such evidence should be treated.

The starting point for a discussion of the implied assertion doctrine is the English case of *Wright v. Doe d. Tatham,* 112 Eng. Rep. 488 (Exch. Ch. 1837) and 47 Rev. Rep. 136 (H.L. 1838). The case involved a will and the competency of the testator. The decedent Marsden had left his estate to his steward Wright. Marsden's heir at law, Admiral Tatham, challenged the will on grounds of testamentary incapacity. In defense of the will, before the Court of King's Bench, Wright sought to introduce several letters that Marsden had received from various correspondents. One letter concerned a legal dispute, three concerned business or politics, one thanked Marsden for having appointed the writer to a curateship, and one described a cousin's voyage to America. *Wright,* 112 Eng. Rep. 490–92. Wright did not seek to prove the truth of any explicit factual statement within the letters. Wright argued that the letters were composed in such a way as to indicate that their writers believed Marsden sane and of normal intelligence. From the writers' belief in Marsden's competence, Wright argued, one could infer that Marsden was competent. The letters were excluded as hearsay. On appeal in the Exchequer Chamber, Baron Parke explained as follows:

> "[P]roof of a particular fact ... implying a statement or opinion of a third party on the matter in issue, is inadmissable in all cases where such a statement or opinion not on oath would be of itself inadmissable; and, therefore, in this case the letters which are offered only to prove the competence of the testator, that is the truth of the implied statements therein contained, were properly rejected, as the mere statement or opinion of the writer would certainly have been inadmissible."

*Id.* at 516–17.

In reaching his conclusion, Baron Parke introduced the oft-quoted discussion of a sea captain, who after examining his

ship carefully, left on an ocean voyage with his family aboard. According to Baron Parke, the captain's conduct would constitute hearsay if offered to prove that the ship had been seaworthy. *Id.* at 516.

> "Baron Parke used the illustration to show that such nonverbal conduct would nevertheless constitute hearsay because its value as evidence depended on the belief of the actor. This illustration was important in the court's analysis because the main problem sought to be avoided by the rule against hearsay—an inability to cross-examine the declarant—is the same whether or not the assertion is implied from a verbal statement or implied from nonverbal conduct. Thus, assertions that are relevant only as implying a statement or opinion of the absent declarant on the matter at issue constitute hearsay in the same way the actual statement or opinion of the absent declarant would be inadmissible hearsay."

*State v. Dullard,* 668 N.W.2d 585, 591 (Iowa 2003) (citations omitted).

For our purposes, Baron Parke's reasoning, and the common-law view, may be expressed as follows: (1) An out-of-court statement is hearsay when offered to establish the truth of a proposition expressed therein; (2) A letter stating "I believe Marsden to be competent" would be hearsay if offered to prove that Marsden was competent; (3) These letters—of which the tone and content imply a belief in Marsden's competence—are being offered as the functional equivalents of letters directly professing a belief in Marsden's competence; (4) Thus, as offered, these letters express the proposition that Marsden is competent; and (5) Therefore, these letters are hearsay if offered to prove Marsden's competence. Stated more generally, the doctrine holds that where a declarant's out-of-court words imply a belief in the truth of X, such words are hearsay if offered to prove that X is true.

In its original *Wright v. Tatham* form, the doctrine did not inquire into the declarant's intent—beliefs communicated accidentally by implication are as much "implied assertions" as

beliefs expressed purposefully in an indirect manner. As evidenced by the "sea captain" hypothetical, the doctrine also did not distinguish between words and non-verbal conduct.

### B. Federal Rule of Evidence 801(a) and Its Advisory Committee Note

Perhaps the most significant development in the American judicial treatment of implied assertions was the 1973 adoption of the Federal Rules of Evidence, and the subsequent adoption by numerous states—including this State—of substantially similar rules The drafters of the Federal Rules apparently agreed with commentators' criticisms of the common law rule that implied assertions should be treated as hearsay. They expressly abolished the implied assertions doctrine with respect to non-verbal conduct not intended by the actor as a communication. As to words, the drafters were more equivocal while the Advisory Committee note to Fed.R.Evid. 801(a) states that "nothing is an assertion unless intended to be one."

Fed.R.Evid. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(a) defines "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

As to non-verbal conduct, the Rule injects unequivocally an intent requirement into the common-law implied assertion doctrine. Non-verbal conduct is not a "statement" under the Rule—and thus cannot be hearsay—unless the actor intended the conduct to be an assertion. A definition of "assertion" is not necessary to reach this conclusion; part two of the rule contains the word "intended" explicitly.

The part of the Rule governing speech and writing does not contain the word "intended." Rather, words qualify as a "statement" under the Rule if they constitute "an oral or written assertion." The question of whether the Rule incorporates an intent requirement with respect to words depends

upon whether "assertion," standing alone, denotes an *intentional* communication.

Although the federal Rule does not define "assertion," the Advisory Committee note to the Rule states that "nothing is an assertion unless intended to be one." 56 F.R.D. 183, 293 (1972). The Advisory Committee's view with respect to words appears to be as follows: If the declarant intended to communicate the factual proposition which the words are offered to prove as true, then the words are hearsay. If the declarant did not intend to communicate that proposition, the words are not hearsay.

The federal Advisory Committee note has been the source of disagreement in the courts and among scholars. Some federal courts construe Fed.R.Evid. 801(a) in accord with the Advisory Committee note. *See, e.g., United States v. Long,* 905 F.2d 1572, 1579–80 (D.C.Cir.1990) (citing Advisory Committee note in holding that telephone conversation testified to by police officer was not hearsay where the caller inquired about drug transaction because no assertion was intended by caller); *United States v. Lewis,* 902 F.2d 1176, 1179 (5th Cir.1990) (same); *United States v. Perez,* 658 F.2d 654, 659 (9th Cir.1981) (citing Advisory Committee note in holding use of defendant's name on telephone non-hearsay when offered to prove defendant was on the line; declarant impliedly believed defendant was on the line but did not intend to assert that fact); *United States v. Zenni,* 492 F.Supp. 464, 469 (E.D.Ky. 1980) (citing Advisory Committee in ruling that telephone instructions to place bets were non-hearsay when offered to prove defendant was a bookmaker because callers did not intend to assert that defendant was a bookmaker when placing their bets).

Other courts have interpreted the Rule with a different result. *See, e.g., United States v. Palma–Ruedas,* 121 F.3d 841, 857 (3d Cir.1997), *rev'd on other grounds,* 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999) (holding statement "nice to meet you" hearsay when offered to prove truth of implication that declarant was meeting listener for the first

time); *United States v. Reynolds*, 715 F.2d 99, 104 (3d Cir. 1983) (holding phrase "I didn't tell them anything about you" hearsay when offered to prove truth of implication that defendant was participant in crime); *Lyle v. Koehler*, 720 F.2d 426, 432–33 (6th Cir.1983) (holding letters detailing request for recipient to give false alibi testimony hearsay when offered to prove truth of implication that declarant and co-conspirator defendant were guilty).

## C. The Task of Defining "Assertion" Left to the Courts in Maryland

In the testamentary capacity case of *Waters v. Waters*, 35 Md. 531 (1872), this Court considered whether certain letters were admissible to show "the manner in which the testator was treated, in regard to matters of business . . . by one well acquainted with him," in order to establish the letter-writer's opinions "in regard to the sanity of the testator, and his competency to transact business." *Id.* at 543. In excluding the letters, the Court adopted the rule laid down in *Wright v. Tatham*, which had presented substantially the same factual senario. Maryland Rules 5–801(a), 5–801(c), and 5–802 are identical to the federal counterparts, and, as discussed *supra*, many federal courts have rejected the *Wright v. Tatham* proposition that out-of-court words are hearsay when offered to prove facts that the declarant impliedly believed but did not intend to communicate.

When the words of a Maryland rule and federal rule are the same or similar, often we look to interpretations of the federal rule in construing the Maryland Rule. *See e.g., Ragland v. State*, 385 Md. 706, 720, 870 A.2d 609, 617 (2005); *Beatty v. Trailmaster*, 330 Md. 726, 738 n. 8, 625 A.2d 1005, 1011 n. 8 (1993). Federal court interpretations of federal rules are considered persuasive, but are not binding on this Court in interpreting a Maryland rule. *See e.g., Pinkney v. State*, 350 Md. 201, 235, 711 A.2d 205, 222 (1998); *State v. Matusky*, 343 Md. 467, 490, 682 A.2d 694, 705 (1996); *Walker v. State*, 338 Md. 253, 260, 658 A.2d 239, 242 (1995).

The Committee note to Md. Rule 5–801 departs substantially from its federal counterpart. Rather than restricting the definition of "assertion," the note "does not attempt to define 'assertion,' a concept best left to development in the case law." It is clear that in adopting the Maryland Rule, this Court did not intend to adopt the federal Advisory Committee's view that "nothing is an assertion unless intended to be one," but rather intended to leave to case law the viability of the rule of *Wright v. Tatham.*

### D. Theory Underlying the Rule Against Hearsay in General

In order to determine whether the unintentional implications of words should remain within the definition of hearsay, we first look to the theory underlying the rule against hearsay in general. In contrast to the intent-based approach of the federal Advisory Committee, scholars have focused on the veracity of the declarant and have identified four factors (sometimes termed "testimonial inferences"): (1) sincerity (the danger of fabrication); (2) narration (the danger of ambiguity); (3) perception (the danger of inaccurate observation); and (4) memory (the danger of faulty recollection). *See* Edmund M. Morgan, *Hearsay Dangers and the Application of the Hearsay Concept,* 62 Harv. L.Rev. 177, 185–88, 218 (1948) (stating that "the rational basis for the hearsay classification is not the formula, 'assertions offered for the truth of the matter asserted,' but rather the presence of substantial risks of insincerity, and faulty narration, memory and perception. . . .") *See also* 4 Clifford S. Fishman, Jones on Evidence § 24–1 at 209 (2000); 2 McCormick on Evidence § 245 at 93 (John W. Strong ed., 5th ed.1999); Ronald J. Bacigal, *Implied Hearsay: Defusing the Battle Line Between Pragmatism and Theory,* 11 S. Ill. U. L.J. 1127, 1130; Ted Finman, *Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence,* 14 Stan. L.Rev. 682, 684–85 (1962).

Each of the four inferences is strengthened by the requirement that testimony be given in court, under oath, and subject to cross-examination. The witness's presence allows the fact

finder to observe physical limitations affecting perception, hesitancy or inconsistency suggesting imperfect memory, unclear or idiosyncratic use of language rendering narration ambiguous, or a demeanor suggestive of intentional falsehood. The oath, and with it the threat of prosecution for perjury, increases the likelihood of sincerity.

Most important to the testimonial inferences is the availability of cross-examination, a procedure Professor John Wigmore described as "beyond any doubt the greatest legal engine ever invented for the discovery of truth." Wigmore, *supra*, § 1376, at 32. All four inferences may be called into question by cross-examination.

When, in lieu of in-court, sworn testimony, a fact is presented to the fact finder from an out-of-court declarant, the four inferences are undermined considerably. The declarant's bare words reveal little or nothing about the circumstances under which the declarant came to believe the factual proposition communicated, nor about the accuracy of the declarant's memory. They do not indicate the declarant's tone or demeanor, the circumstances surrounding the utterance, or the motives which might have influenced the declarant to speak falsely. It is cross-examination, combined with the safeguards of presence and oath, that shores up the inferences of perception, memory, narration, and sincerity.

### E. Hearsay Theory As It Relates to the Unintended Implications of Words

The State points to the federal Advisory Committee note to Fed.R.Evid. 801(a), stating that both verbal and nonverbal implied assertions, if unintentional, should be excluded from the definition of hearsay. The Committee note states as follows:

> "[N]onverbal conduct ... may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred. This sequence is, arguably, in effect an assertion of the existence of the condition and hence properly includable within the

hearsay concept. Admittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, but the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds. No class of evidence is free of the possibility of fabrication, but the likelihood is less with nonverbal than with assertive verbal conduct. The situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reliance will bear heavily upon the weight to be given the evidence. Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded from the definition of hearsay by the language of subdivision (c)."

56 F.R.D. 183, 293 (1972) (citations omitted).

The view expressed in the federal Committee note has been criticized in court cases and by legal commentators. The notion that evidence "untested with respect to the perception, memory, and narration (or their equivalents) of the actor" poses minimal dangers "in the absence of an intent to assert" has been labeled a *non sequitur* on the grounds that the inferences of perception, memory, and narration are wholly independent from any intention to assert. The fact that a declarant may not have intended to communicate a particular factual proposition reveals nothing about the circumstances under which the declarant came to believe that proposition, nor about the clarity with which the declarant remembers the underlying events. Professor Paul Rice explains the point as follows:

"Of the four dangers giving rise to the hearsay exclusionary rule—perception, memory, sincerity, and ambiguity—the assertive/nonassertive distinction addresses only one: the danger of insincerity (*i.e.* intentional misrepresentation). If a declarant possesses no intention of asserting anything, it would seem to follow that he also possesses no intention of

misrepresenting anything. It is a *non sequitur* to conclude from this, as the Advisory Committee has, that the remaining dangers of perception, memory, and ambiguity are automatically minimized with this assurance of sincerity. The logical link which the Advisory Committee finds between sincerity and error is simply nonexistent."

Paul R. Rice, *Should Unintended Implications of Speech be Considered Nonhearsay? The Assertive/Nonassertive Distinction Under Rule 801(a) of the Federal Rules of Evidence,* 65 Temp. L.Rev. 529, 531 (1992).[2] See also David E. Seidelson, *Implied Assertions and Federal Rule of Evidence 801: A Continuing Quandary for Federal Courts,* 16 Miss. C.L.Rev. 33, 34–35 (1995); Bacigal, *supra,* at 1132; Finman, *supra,* at 685–86.

The Supreme Court of Iowa echoed these concerns in *State v. Dullard,* 668 N.W.2d 585, 590 (Iowa 2003):

"[T]he persuasiveness of the committee notes on implied assertions is undermined by the clear split of authority among the federal circuit courts, as well as many legal scholars.

\* \* \*

The circumstances of this case, as well as other cases, can make it tempting to minimize hearsay dangers when a declaration is assertive but offered as a basis for inferring a belief of the declarant that most likely was not a significant

---

**2.** Professor Rice reiterated this point recently, noting as follows:

"The definition of hearsay in Rule 801 incorporates the assertive/nonassertive distinction, which admits unintended statements of an out-of-court declarant as non-hearsay. Even though the hearsay problems of perception, memory and ambiguity are still present, the statement is admitted for the truth of its content, and since it was unintended, the statement must be sincere. *This distinction is illogical to the point of being absurd.* The most that a nonassertive statement can guarantee is that it is sincerely erroneous. To make matters worse, courts are interpreting and applying the assertive/nonassertive distinction in different ways."

Paul R. Rice, Symposium Federal Privileges In The 21st Century Back to the Future with Privileges Abandon Codification, Not the Common Law, 38 Loy. L.A. L.Rev. 739, 764–765 (2004) (emphasis added).

aspect of the communication process at the time the declaration was made. Absent unusual circumstances, the unknown declarant likely would not have thought about communicating the implied belief at issue, and this lack of intent arguably justifies excluding the assertion from the hearsay rule. Nevertheless, we are not convinced that the absence of intent necessarily makes the underlying belief more reliable, especially when the belief is derived from verbal conduct as opposed to nonverbal conduct.

Four dangers are generally identified to justify the exclusion of out-of-court statements under the hearsay rule: erroneous memory, faulty perception, ambiguity, and insincerity or misrepresentation. Yet, the distinction drawn between intended and unintended conduct or speech only implicates the danger of insincerity, based on the assumption that a person who lacks an intent to assert something also lacks an intent to misrepresent."

*Id.* at 593–94 (citations omitted).

With respect to the danger of ambiguous narration, Professor Ronald Bacigal suggests that absence of an intent to communicate actually *increases* the danger of misunderstanding. He explains this theory as follows:

"If there is a distinction in the ambiguity of intended and implied assertions, the distinction indicates that unintended implied assertions are inherently more ambiguous. When a declarant consciously intends to communicate with an observer, he desires his communication to be understood by that observer.... With unintentional implied assertions, however, the declarant makes no effort to avoid ambiguity, because there is no intent to convey his message to anyone. Thus, unintentional implied assertions have an inherently greater potential to be more ambiguous than intended assertions. The Federal Rules have it backward by classifying the less ambiguous intended assertions as hearsay, while classifying the more ambiguous unintentional assertions as nonhearsay."

Ronald J. Bacigal, *Implied Hearsay: Defusing the Battle Line Between Pragmatism and Theory*, 11 S. Ill. U. L.J. 1127, 1132 (1987).

The federal Committee Note has been criticized also for conflating its analysis of the dangers posed by words with the dangers posed by nonverbal conduct. In particular, critics argue that language almost always conveys some intended meaning, and that the value of words as evidence of an underlying belief will necessarily depend on the sincerity with which the intentional meaning of those words is communicated.[3] Professor Rice addresses this problem as follows:

"If the justification for the assertive/nonassertive distinction is the absence of the insincerity problem, and through that guarantee of sincerity a reduced level of perception, memory, and ambiguity problems, this justification cannot be applied to implied statements from speech. Speech is a mechanism of communication; it is virtually always used for the purpose of communicating something to someone. It is illogical to conclude that the question of sincerity is eliminated and that the problem of unreliability is reduced for unintended implications of speech if that speech might have been insincere in the first instance, relative to the direct message intentionally communicated. If potential insincerity is injected into the utterance of words that form the basis for the implied communication, the implication from the speech is as untrustworthy as the utterance upon which it is based."

Rice, *supra,* at 534. Professor Michael Graham considers this problem in his *Handbook of Federal Evidence:*

---

**3.** The concurring opinion argues that the majority has committed itself to an "antiquated and wholly illogical view" by adhering to the implied assertions doctrine as it relates to assertions implied from out-of-court words. Concurring op. at 714–15, 887 A.2d at 584. Despite the claimed illogic of the Court's holding today, the concurring opinion has not even attempted to answer our central argument that, with respect to assertions implied from out-of-court *words,* all four hearsay concerns of sincerity, narration, perception, and memory are still present.

"The Advisory Committee's apparent attempted rejection of *Wright v. Doe d. Tatham* is as unfortunate as it is incorrect. When a statement is offered to infer the declarant's state of mind from which a given fact is inferred in the form of an opinion or otherwise, since the truth of the matter asserted must be assumed in order for the nonasserted inference to be drawn, the statement is properly classified as hearsay under the language of [Fed. R. Evid] 801(c). Since the matter asserted in the statement must be true, a reduction in the risk of sincerity is not present. The Advisory Committee's reliance on the analogy to nonverbal nonassertive conduct where a reduction in the risk of fabrication is caused by a lack of intent to assert anything is thus clearly misconceived."

3 Michael H. Graham, *Handbook of Federal Evidence* § 801.7, at 73–77 (5th ed.2001) (citations omitted).[4]

---

4. The concurring opinion's discussion of the treatment of the implied assertions doctrine in the treatises is incomplete. The discussion leaves the impression that it is presently beyond serious dispute that the Federal Rules of Evidence reject the implied assertion doctrine in total, and rightly so. *See generally* concurring op. at 730–32, 887 A.2d at 593–94. For instance, the concurring opinion says the following about Mueller and Kirkpatrick's FEDERAL EVIDENCE:

"Mueller and Kirkpatrick purport to see some limited lingering value in *Wright's* analysis of the so-called 'two-step inference' (belief from conduct, fact from belief), but they acknowledge that 'FRE 801 rejects the broad proposition endorsed by Baron Parke' and suggest that, 'arguably, it would be wiser to forget *Wright* than continue to discuss it.' "

Concurring op. at 730, 887 A.2d at 593 (quoting Christopher B. Mueller and Laird C. Kirkpatrick, FEDERAL EVIDENCE § 378 (2d ed.1994)). The concurring opinion seems to be implying here that Mueller and Kirpatrick believe (1) that the implied assertion doctrine is inconsistent with the Federal Rules of Evidence, and therefore (2) that *Wright* is no longer significant in the law of evidence because the doctrine developed in it has been rejected. Neither of these propositions is actually supported by what Mueller and Kirkpatrick say.

The "broad proposition" in *Wright* that Mueller and Kirpatrick say is rejected by Federal Rule of Evidence 801 is that assertions implied from *any* conduct, verbal or nonverbal, are "statements" for purposes of the hearsay rule. Mueller and Kirkpatrick, *supra* § 378. In fact, Mueller and Kirkpatrick recognize that *Wright* is of continuing significance precisely because the issue of whether assertions implied from *words* are "statements" for purposes of the hearsay rule is an open

The Iowa Supreme Court addressed this issue in *Dullard*, reasoning as follows:

"[E]ven the danger of insincerity may continue to be present in those instances where the reliability of the direct assertion may be questioned. If the expressed assertion is insincere, such as a fabricated story, the implied assertion derived from the expressed assertion will similarly be unreliable. Implied assertions can be no more reliable than the predicate expressed assertion."

*Dullard*, 668 N.W.2d at 594.

■ We conclude that, with respect to the four testimonial inferences, out-of-court words offered for the truth of unintentional implications are not different substantially from out-of-court words offered for the truth of intentional communications. The declarant's lack of intent to communicate the implied proposition does not increase the reliability of the declarant's words in a degree sufficient to justify exemption from the hearsay rule. Said another way, we conclude that a declarant's lack of intent to communicate a belief in the truth of a particular proposition is irrelevant to the determination of whether the words are hearsay when offered to prove the truth of that proposition.

■ We hold that where the probative value of words, as offered, depends on the declarant having communicated a factual proposition[5], the words constitute an "assertion" of that proposition. The declarant's intent *vel non* to communicate the proposition is irrelevant. If the words are uttered out of court, then offered in court to prove the truth of the

---

question under the Federal Rules. Mueller and Kirkpatrick go on to argue that a case can be made that the exclusion of the letters in *Wright* would be the correct result if the case were decided under the Federal Rules because, unlike a case of nonverbal conduct, "the authors of the letters expressed ideas and information." Mueller and Kirkpatrick, *supra* § 378.

5.  A reasonable test is to ask whether the words would remain probative if it could be established that the declarant *did not believe* the factual proposition for which they are offered.

proposition—*i.e.* of the "matter asserted"—they are hearsay under our rules.

### F.   Other Courts in Accord with Our View

Other courts, albeit a minority, around the country have adopted the same approach to the interpretation of the Federal Rules of Evidence or Federal Rules-derived hearsay provisions.[6]   In *United States v. Reynolds*, 715 F.2d 99 (3d Cir. 1983), appellant Parran's co-defendant Reynolds had been arrested after attempting to negotiate a stolen unemployment compensation check.   *Id.* at 101.   Postal inspectors testified that after Reynolds's arrest he said to Parran "I didn't tell them anything about you."   *Id.* The government offered this testimony as evidence of a conspiracy between Reynolds and Parran, and of Parran's participation in the offenses charged. The United States Court of Appeals for the Third Circuit found that this evidence was hearsay as offered.   The Court stated as follows:

> "Reynolds' statement is . . . ambiguous and susceptible to different interpretations.   As the government uses it, the statement's probative value depends on the truth of an assumed fact it implies.   Unless the trier assumes that the statement implies that Reynolds did not tell the postal

---

**6.**   Inasmuch as the concurring opinion fails to address the policy considerations the majority opinion has advanced, the concurring opinion's argument amounts ultimately to the claim that this Court should reject this view simply because the majority of federal circuits and state courts have done so.   This Court has never taken the approach that it should decide issues not peculiar to Maryland law in accordance with a majority view simply because it is the majority view.   *See, e.g., Cheek v. United Healthcare*, 378 Md. 139, 144, 167, 835 A.2d 656, 659, 673 (2003) (holding that arbitration agreement was unenforceable for lack of consideration because employer's promise to arbitrate was illusory given that employer had unfettered discretion to rescind or alter the arbitration agreement, despite dissenting opinion noting that the majority view is that arbitration agreements of this sort are enforceable because employer gives consideration in form of employment offered to employee).   Further, the fact that we are interpreting the Maryland Rules of Evidence provides no special reason to automatically follow the majority rule, as these very rules require us to exercise our independent judgment in interpreting them so that "truth may be ascertained and proceedings justly determined."   Md. Rule 5-102.

inspectors that Parran was involved in the conspiracy to defraud, even though Parran was in fact involved, the statement carries no probative weight for the government's case. For if the trier assumes that the statement implied that Reynolds did not tell the postal inspectors that Parran was involved because there was nothing to tell, the statement has no relevance to the government's case.

Its only relevance to the government's case is tied to an assumed fact of petitioner's guilt that the government argues the utterance proves. Thus, depending on the interpretation given the content of Reynolds' statement, it is either probative or not. Consequently, we believe that, as the government uses it, the statement's relevance goes well beyond the fact that it was uttered. It is not merely intended to prove that Reynolds could speak, or that he could speak in English, or even that he directed a statement toward Parran. Instead, the government offers it to prove the truth of the assumed fact of defendant's guilt implied by its content."

*Id.* at 103.

The Third Circuit addressed this issue again in *United States v. Palma–Ruedas*, 121 F.3d 841 (3d Cir.1997). Appellant Quinones was charged with, *inter alia,* participation in a drug conspiracy and the kidnaping of his erstwhile confederate Ephrain Avendano. *Id.* at 845. Under the government's theory of the case, Quinones and Avendano had met to discuss details of the drug conspiracy. After a deal had gone sour, other members of the conspiracy had held Avendano against his will for four weeks, transporting him from Texas to New Jersey. Avendano and his captors had arrived at Quinones's New Jersey house, then traveled to a house in Maryland. Quinones had also gone to the Maryland house, but in a different car than Avendano. Under Quinones's theory of the case, he had not been a member of the drug conspiracy and hence had not met Avendano previously, nor had he known that Avendano was in captivity. *Id.* at 857.

At trial, Quinones tried to introduce testimony that he had said "nice to meet you" upon Avendano's arrival at his house to show that he had not met Avendano previously and did not know he was in captivity. The district court excluded this evidence as hearsay. The Third Circuit affirmed, reasoning as follows:

"Quinones makes a hypertechnical, syntactic argument by asserting that the relevance of the statement was not that Quinones really thought that 'it was nice' to meet Avendano but, rather, merely that the statements were said. Quinones's counsel, however, undermined this argument in closing when he asserted that Quinones could not have been at the November 1994 meeting 'because they never met before January 1, 1995.' While Quinones may not have offered the statement for its express meaning, he did offer it for the implied assertion that he had never met Avendano. *Statements offered to support an implied assertion are inadmissible hearsay.*"

*Id.* (citations omitted) (emphasis added).

In *Lyle v. Koehler*, 720 F.2d 426 (6th Cir.1983), petitioner Lyle challenged his Michigan murder conviction on federal *habeas corpus.* He claimed that his Sixth Amendment right of confrontation had been violated by the introduction of letters written by his co-defendant Kemp while awaiting trial. *Id.* at 429. Kemp had written to two potential witnesses, outlining the (presumably perjured) testimony he wished them to give at trial. Eschewing a confrontational clause analysis, the United States Court of Appeals for the Sixth Circuit employed a "conventional hearsay analysis." The court found these letters to be hearsay, stating as follows:

"Believing the alibi to be false, the prosecution obviously did not seek to introduce the letters in order to demonstrate the truth of the particular statements they contained. Rather, the government intended to have the jury infer from the statements that Kemp was attempting to obtain fabricated alibi testimony, an act that revealed a 'guilty mind' on his part regarding the shootings. This guilty mind inference in turn invited the jury to infer Kemp's substantive guilt.

Thus, in determining whether the letters constitute hearsay, we must decide whether the inferences that the government sought to elicit by introducing them should be included within the set of 'assertions' that the letters make.

\* \* \*

Although we consider the question of the proper classification of the letters exceedingly close, we find that the inferences they necessarily invite form an integral part of the letters. They were introduced because by inference they assert the proposition of fact that Kemp and Lyle committed the robbery and hence need an alibi. Accordingly, we conclude that the letters are hearsay."

*Id.* at 432–33 (citations omitted).

In *State v. Dullard*, 668 N.W.2d 585, 590 (Iowa 2003), the petitioner had been convicted of possessing pseudoephedrine with the intent to use it as a precursor to the manufacture of methamphetamine. Police had discovered the pseudoephedrine (a common over-the-counter drug not itself illegal to possess absent an intent to use it as a precursor) in a search of Dullard's garage. Other items used in the manufacture of methamphetamine were also discovered, along with a notebook containing the following words:

"B—

I had to go inside to pee + calm my nerves somewhat down.

When I came out to go get Brian I looked over to the street North of here + there sat a black + white w/the dude out of his car facing our own direction—no one else was with him."

*Id.* at 588. Over Dullard's hearsay objection, the State introduced the notebook at trial, arguing that the note, presumably identifying Brett Dullard by his first initial, was offered to tie Dullard to the garage and its contents, not for the truth of any matter asserted therein.

The Iowa Supreme Court found that the words in the notebook were hearsay, because they had been "offered solely

to show the declarant's belief, implied from the words and the message conveyed, in a fact the State seeks to prove—Dullard's knowledge and possession of drug lab materials." *Id.* at 591. The court recognized that Iowa Rule of Evidence 5.801 was substantially identical to Fed.R.Evid. 801, and that under the federal Advisory Committee's view, the notebook would not constitute hearsay when offered for this purpose. The court then stated as follows:

"The consequence of the committee's approach is to admit into evidence a declarant's belief in the existence of a fact the evidence is offered to prove, without cross-examination, just as if the declarant had explicitly stated the belief. Yet, if the declarant of the written note in this case had intended to declare his or her belief that Dullard had knowledge and possession of drug lab materials, the note would unquestionably constitute hearsay. Implied assertions from speech intended as communication clearly come within the definition of a statement under rule 5.801(a)(1). Unlike the committee, however, we do not believe indirect or unintentional assertions in speech are reliable enough to avoid the hearsay rule. We think the best approach is to evaluate the relevant assertion in the context of the purpose for which the evidence is offered.

We recognize this approach will have a tendency to make most implied assertions hearsay. However, we view this in a favorable manner because it means the evidence will be judged for its admission at trial based on accepted exceptions or exclusions to the hearsay rule. It also establishes a better, more straightforward rule for litigants and trial courts to understand and apply."

*Dullard,* 668 N.W.2d at 594–95 (citations omitted).

The Court of Appeals of Texas also rejected the federal Advisory Committee approach to hearsay, concluding that " '[m]atter asserted' includes any matter explicitly asserted, and any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief as to the matter." *Mosley v. State,* 141 S.W.3d 816, 829 (Tex.Ct. App.2004). The court held that the words, "Well, I can't

watch them all the time" were hearsay under Tex.R. Evid. 801 when offered to prove the truth of the declarant's implied belief that her husband had sexually assaulted their grand daughter.

Other jurisdictions applying the common law, rather than rules-based evidentiary regimes, also retain the *Wright v. Tatham* view.[7] *See, e.g., Ginyard v. United States,* 816 A.2d 21, 40 (D.C.2003) (advice to urinate on hand was hearsay when offered to prove truth of declarant's implied belief that listener had recently fired a gun and needed to eliminate residue); *Brown v. Commonwealth,* 25 Va.App. 171, 487 S.E.2d 248, 252 (1997) (question "does Peggy know I'm here" was hearsay under the common law when offered to prove that declarant was personally acquainted with Peggy).

## G. Can a Question be a "Statement?"

Having rejected the declarant-intent basis for determining whether an utterance is an "assertion," and hence a "statement" capable of being hearsay, we turn next to the narrower issue of whether an utterance may qualify as an "assertion" and a "statement" if it occurs in the form of a question. The grammatical form of an utterance does not control whether the words are hearsay. As the Committee note to Maryland Rule 5–801 explains, "[t]he fact that proffered evidence is in the form of a question or something other than a narrative statement ... does not necessarily preclude its being an assertion."

---

**7.** The concurring opinion's proposed rule, in contrast to the common law rule we reaffirm today, would be difficult to apply in practice, particularly in situations where trial judges are required to make immediate decisions on hearsay objections. In many instances, it is simply unclear, particularly at first glance, whether a declarant intended an assertion that is implied by the words he or she has used. In such situations, the concurring opinion's proposed rule would leave trial judges with little practical guidance. *See Dullard,* 668 N.W.2d at 595 (recognizing implied assertion doctrine because it "establishes a better, more straightforward rule for litigants and trial courts to understand and apply" than the federal advisory committee approach).

Our definition of hearsay leads to the conclusion that the particular form of an utterance is not determinative of whether an utterance is an "assertion" and hence potential hearsay. An out-of-court question may be probative because, by asking it, the declarant potentially communicated a given factual proposition. Offering the question to prove the truth of that proposition presents the dangers we have explained *supra*. Through faulty perception or memory, the declarant may have been mistaken in believing the proposition at issue. Through the declarant's ambiguous use of language, the fact finder may misunderstand what the declarant was asking, and thus draw incorrect inferences to supposed implications. The declarant may have been insincere in asking the question—*i.e.* may have been pretending ignorance as to the subject matter or feigning interest in the information sought—thus giving rise to misleading inferences about his or her underlying beliefs.

In *Brown v. Commonwealth*, 25 Va.App. 171, 487 S.E.2d 248, 252 (1997), the defendant was charged with burglary and sex crimes after he allegedly broke into a woman's apartment and sexually assaulted her. Brown claimed that the complainant had consented to the sexual acts and to his entry into her apartment, and contended that they had known each other for some time. In support of this theory, Brown sought to introduce a police officer's testimony that Brown had asked "does Peggy know I'm here" during his detention at a police station. The trial court held that these words were hearsay. The Virginia Court of Appeals affirmed, explaining as follows:

"The defendant offered the statement, 'Does Peggy know I am here?', to prove by implication from the question that he personally knew the victim. In order for the jury to infer from the statement that the defendant knew the victim, the jury had to determine the truth or falsity of the implied assertion. The statement's probative value depended entirely upon the truth of an inferred fact that the statement implied and as such it was hearsay.

Defendant's statement to Officer Berryman was not relevant for any other purpose and the fact that the statement was made in no way proved the defendant's relationship

with the victim unless the truthfulness of the implied assertion was accepted. Therefore, the statement was offered to prove the truth of its content and it was inadmissible hearsay."

*Id.* at 252.

## IV.

■ Under the approach we have set out, Jasmine Pritchett's words were hearsay as utilized. Jasmine spoke the words "is Erik going to get me?" Under the State's theory of this case, by speaking these words, Jasmine impliedly communicated that she had witnessed Erik Stoddard assaulting Calen DiRubbo. The State offered these words to prove the truth of that implied factual proposition, *i.e.* to prove that Jasmine had in fact witnessed Stoddard assaulting Calen.

In order to accept the words "is Erik going to get me" as evidence that Jasmine witnessed Erik Stoddard assaulting Calen DiRubbo, the jury needed to make numerous inferences. It needed to infer first that Jasmine meant those words to convey a sincere inquiry as to whether Erik Stoddard was going to harm her. It needed to infer next that, by making this inquiry, Jasmine revealed unambiguously a belief that she had witnessed Stoddard assaulting Calen. It needed to infer further that Jasmine remembered accurately her perceptions of June 15, 2002. And it needed to infer finally that Jasmine's perceptions were correct at the moment she experienced them.

In the absence of cross-examination, and particularly in light of Jasmine's age,[8] these inferences are largely untested and unsupportable. The jury had no information about the context in which Jasmine spoke these words, and hence little

---

8. Jennifer referred to Jasmine as having been eighteen months old at the time of Calen's death on June 15, 2002. The date on which Jasmine spoke the words at issue is not evident from the record. Jennifer testified on March 10, 2003. Jasmine was thus somewhere between eighteen and twenty-seven months old at the time she asked "is Erik going to get me?"

basis from which to conclude that she used "get" to mean "harm," or that these words were spoken seriously and not in play. The jury had no information about other, unrelated reasons why Jasmine might have feared Stoddard. It had no information about Jasmine's ability to remember accurately past events, nor any information about the amount of time that had elapsed between Calen's death and Jasmine's utterance. It had no information about factors that would have affected Jasmine's perceptions during the alleged assault, such as distance, angle of view, obstructions, or Jasmine's cognitive ability to distinguish an assault from some other frightening but innocuous event.

Jasmine's out-of-court question, repeated in court by her mother with minimal information as to its context, is unreliable as evidence that Jasmine had witnessed Stoddard assault Calen. The question is untested as to narration/ambiguity and sincerity. Its relationship to the factual proposition it supposedly implies is untested as to ambiguity. Jasmine's belief in the implied proposition, even if genuine, is untested as to memory and perception. The dangers that arose from the State's use of this question demonstrate the continued utility of the common law approach to hearsay.

## V.

The State contends that any error in the admission of Jasmine's question was harmless. We disagree. To be harmless, we must be convinced beyond a reasonable doubt that the error in no way influenced the verdict. *See Ragland v. State,* 385 Md. 706, 726, 870 A.2d 609, 621 (2005); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

The State's remaining evidence against Stoddard was circumstantial, demonstrating principally that (1) Stoddard had access to Calen during the medically-established time frame for the fatal blow; and (2) Stoddard might have been physically abusing Calen prior to her death. The State could not exclude the five other adults who had access to Calen during

the time frame, nor could it establish that Stoddard was in fact responsible for Calen's earlier injuries.

The State corroborated the case with the direct evidence of a purported eyewitness to the murder. The State's contention that "[Jasmine] saw. She was the eyewitness. She saw what happened to Calen that day," if believed by the jury, would be powerful evidence to establish Stoddard as the murderer.

Jasmine was not a competent witness, and she was unavailable to testify at trial. The State attempted to present her "eyewitness" testimony in two ways. It introduced Jasmine's mother's observations about a marked change in Jasmine's behavior after Calen's death, and elicited the utterance that is the subject of this appeal. We cannot say that the introduction of Jasmine's question "is Erik going to get me" did not influence the verdict. Because these words were inadmissible hearsay and prejudicial, we reverse.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE CITY.***

WILNER, BATTAGLIA, and GREENE, JJ., concur.

Concurring Opinion by WILNER, J., which BATTAGLIA and GREENE, JJ., join.

Erik Stoddard was charged with murdering three-year-old Calen DiRubbo. The State contended that the murder occurred in the presence of Calen's eighteen-month-old cousin, Jasmine Pritchett. Jasmine was not called as a witness; instead, to support its contention that Jasmine saw what had occurred, the State produced the child's mother, Jennifer Pritchett. Over objection, no longer pressed, the court allowed Jennifer to describe behavioral changes in Jasmine since the time of the murder—that Jasmine had become

petrified of strangers and, upon hearing a loud noise, would break out into hives. The mother said that she had not discussed the case with Jasmine but, when asked whether the child had ever asked any questions about the matter, Jennifer responded, "She asked me if Erik was going to get her."

Stoddard objected on both hearsay and reliability grounds and moved for a mistrial. The State gave a dual response: (1) that the remark was not hearsay because it was in the form of a question and that a question could not constitute a statement for purposes of the hearsay rule, and (2) that the remark was not being offered for its truth, to show that Stoddard was going to "get" the child, but only to show the child's fear of Stoddard. In order to establish some relevance of Jasmine's fear, the State wanted the jury to infer, from that fear, that Jasmine had a reason to fear Stoddard and that the reason for her fear was her observation of Stoddard attacking Calen.[1] The trial court overruled the hearsay objection with the brief comment, "Effects on her, overruled" and denied the motion for mistrial. It did not address Stoddard's concern about reliability.

The Court of Special Appeals affirmed, holding that the remark was a "non-assertive verbal utterance" and was not hearsay. *Stoddard v. State*, 157 Md.App. 247, 850 A.2d 406 (2004). In reaching that result, the intermediate appellate court concluded that, (1) with the adoption of the Maryland Rules of Evidence in 1994, this Court effectively abandoned the "implied assertion" rule enunciated in *Wright v. Doe d. Tatham*, [1837] 7 Adol. & El. 313, 112 Eng. Rep. 488 and followed in *Waters v. Waters*, 35 Md. 531 (1872), and (2) an assertion implied from verbal or non-verbal conduct does not constitute a statement for purposes of the hearsay rule unless the actor actually or necessarily intended his or her conduct to constitute such an assertion.

---

1. That purpose was made clear in the State's closing argument: "She was afraid of Erik. Why? Because she saw. She was the eyewitness. She saw what happened to Calen that day and she was scared to death it was going to happen to her, too."

This Court proposes to reject that conclusion and, with it, the predominant view of courts and commentators throughout the United States, and join but a small handful of courts that continue to adhere to *Wright's* antiquated and wholly illogical view that implied assertions constitute statements for purposes of the hearsay rule even if the declarant never intended his or her conduct to constitute such an assertion. In our view, adherence to such a roundly discarded doctrine is both unwarranted and, in this case, and most cases, unnecessary. We agree that the repetition of Jasmine's question by her mother was inadmissible—hence our concurrence with the result—but adherence to that aspect of *Wright* and *Waters* is not necessary to such a holding.

The child's question was inadmissible for two reasons. First, it *did* constitute inadmissible hearsay, although for a more rational reason than that proffered by the Majority; and second, Jasmine's questionable competence was never established. Jennifer's recounting of Jasmine's question constituted hearsay because (1) whether Jasmine actually intended to assert that she had observed Stoddard assault Calen, the relevance of her question depended entirely on the jury's assuming that she did, indeed, intend by it such an assertion, and (2) that necessarily assumed assertion was offered for its truth. Of perhaps greater significance, in furtherance of the reliability prong of the objection and given Jasmine's very young age—eighteen months when the event occurred and two years at time of trial—the court, at the very least, should have conducted an inquiry into whether Jasmine was competent as a witness. Neither her question nor any assertion that might be implied from it was claimed to be spontaneous or in the nature of an excited utterance. Nor was her question admissible under Maryland Code, § 11–304 of the Criminal Procedure Article. If the child would not have been competent to testify directly to the implied assertion—"I saw Erik attack Calen"— the assertion cannot become admissible by having her mother repeat it. The hearsay rule is a rule of *exclusion;* once outside the realm of excited or spontaneous utterances or statutory admissibility, it cannot make admissible that which

is otherwise inadmissible due to the incompetence of the declarant.

## *Wright and Waters*

The notion that conduct, verbal or non-verbal, that, on its face, does not assert X and may never have been intended by the actor to assert X, nonetheless may constitute an implied assertion of X for purposes of the hearsay rule was first supposedly declared in one of six opinions issued by the Exchequer Chamber in the 1837 English case, *Wright v. Doe d. Tatham*, [1837] 7 Ad. & El. 313, 112 Eng. Rep. 488.

The case concerned the validity of the 1822 Will and 1825 Codicil made by John Marsden, which were challenged on the ground of Marsden's alleged incompetence. That issue was tried four times, was "a legal cause celebre of the early nineteenth century" (*see* Emmeline Garnett, JOHN MARSDEN'S WILL at 1 (Hambledon Press 1998)), and eventually ended up in the House of Lords.

The case arose initially when Rear Admiral Standford Tatham, a cousin and heir of Marsden, filed a caveat to the probate of the Will, within hours after Marsden's death and even before the Will and Codicil were offered for probate. Tatham claimed, alternatively, that Marsden was incompetent to make a Will and that the Will and Codicil were the product of undue influence by Marsden's steward, George Wright, in whose hands the Will and Codicil placed most of the Estate. The case was filed in Chancery, but the issue of Marsden's competence was submitted to a jury. Trial took place in 1830. Ninety-six witnesses testified—35 for Wright and 61 for Tatham—and a great deal of correspondence to and from Marsden was admitted bearing on his competence.

The jury found the Will and Codicil to be valid. The presiding judge declared himself satisfied with the verdict, and a motion for new trial was denied by the Master of the Rolls. Tatham presented his motion then to Lord Chancellor Brougham who, having acted as counsel for Tatham in the matter, requested the assistance of Lord Chief Justice of the Common

Pleas Tindal and the Lord Chief Baron, both of whom opined that the motion should be denied. *See Tatham v. Wright,* [1831] 2 Russ. & Mylne 1. The bill was dismissed with costs.[2]

One of the issues raised by Tatham concerned the correspondence. Chief Justice Tindal noted that "[t]he importance of this long and varied correspondence in deciding on the competence of the testator to make his will is self-evident," and that if it was the genuine correspondence of Marsden, "no one could hesitate to declare that the man who possessed sufficient vigour and energy of mind to carry on this correspondence must be held to possess a disposing power over his own property." *Id.* at 23. Tatham contended that the letters in question were actually written by Wright or someone under his tutelage, a suggestion rejected by the panel.

Dissatisfied with the jury's verdict and the rejection of his motion for new trial, Tatham secretly entered upon one of the properties, executed a bogus lease, withdrew, and then, through his lessee, Doe, filed an action in ejectment against Wright, again raising the issue of Marsden's competence as a testator.[3] A great deal of documentary and testimonial evi-

---

2. Of some interest is the court's ruling with respect to costs: "Not satisfied with alleging that the testator was not of sound and disposing mind, [the bill] brought forward a pretended case of gross fraud and undue influence, most injurious to the character of the Defendant Wright; every part of that case had failed: and it had been established by the verdict of a jury, approved of by the Judge before whom the issue was tried, and ratified by two judgments of this Court, that the will, which the Plaintiff sought to impeach, was the deliberate and valid act of a testator of sound and disposing mind." *Id.* at 31.

3. There is no doubt that the issue tried in the first case, of Marsden's competence as a testator, was the same as that in the second. In the appeal in the second case, the court observed that the only differences between the two cases were that, in the second case Wright was the only defendant and Tatham sued as lessor, whereas in the first, Wright was joined by three other defendants and Tatham had sued in his own right, not as lessor. Otherwise, the court noted, the first action would have been "a suit between the very same parties, upon the same subject matter...." *Wright v. Doe d. Tatham* [1834] 1 Adol. & El. 3, 18–19. A subsequent appellate panel reached the same conclusion. *Wright v. Doe d. Tatham* [1837] 7 Adol. & El. 313, 314 n.(a) ("A former trial had taken place on feigned issues raising the same questions."). It is clear

dence was offered on the issue, including a host of documents that were found among Marsden's effects upon his death. Among those documents were three letters written to Marsden decades before he made his Will, by persons who knew Marsden but who were long deceased at the time of the trial. Presumably in an effort to rebut Tatham's claim that Marsden was *always* incompetent, not just when he drew his 17–page Will and the subsequent Codicil, Wright offered those letters to show that the writers believed, from the nature of the letters, that Marsden was competent at the time the letters were written, from which an inference could be drawn that he was, in fact, competent, not only then, but when he later made his Will and Codicil.

The trial judge, Baron Gurney, rejected the letters, but, of greater significance, he refused to admit the Will unless the sole surviving witness to it—a witness hostile to Wright—was called to testify. Without the Will, the judge directed a verdict for Tatham in the amount of one shilling plus costs, and two exceptions were noted—one dealing with the rejection of the letters and the other complaining of Gurney's refusal to admit the Will. The appellate court announced that it was divided on the first issue but agreed that Gurney erred in excluding the Will. The judgment was reversed on that ground, without discussion of the letters, and a new trial awarded. *Wright v. Tatham*, [1834] 1 Adol. & El. 3. At that second trial, Baron Gurney admitted the letters, and the jury found for Wright. That decision also was reversed, the court holding that the letters were inadmissible. At the third trial, Justice Coleridge rejected the letters, a verdict again resulted for Tatham, and exceptions were noted. The six judges of the appellate panel, the Exchequer Chamber, were equally divid-

---

that, under Maryland law, Tatham's lessee would be regarded as being in privity with Tatham and would be precluded from relitigating the issue of Marsden's competence in the ejectment action. *See Walzl v. King*, 113 Md. 550, 556, 77 A. 1117–19 (1910); *FWB Bank v. Richman*, 354 Md. 472, 731 A.2d 916 (1999); *Prescott v. Coppage*, 266 Md. 562, 572–73, 296 A.2d 150, 155 (1972). Had the case arisen here, it would have been dismissed preliminarily and would never have produced the rulings that it did.

ed, which resulted in an affirmance of the judgment. *Wright v. Tatham* [1837] 7 Adol. & El. 313, 112 Eng. Rep. 488. The House of Lords, on writ of error, asked for the opinion of seventeen judges, and, on the basis of those opinions, it affirmed.

The implied assertion rule emanates mostly from the opinion rendered by Baron Parke for the Exchequer Chamber—one of six rendered by the judges of that Chamber—for that is the one most often quoted for the proposition that implied assertions, whether or not intended as such, constitute statements for purposes of the hearsay rule.

Parke observed that the basis argued for admitting the letters was that they were evidence "of the treatment of the testator as a competent person by individuals acquainted with his habits and personal character," that they were "more than mere statements to a third person indicating an opinion of his competence by those persons," but were "acts done toward the testator by them, which would not have been done if he had been incompetent, and from which, therefore a legitimate inference may, it is argued, be derived that he was so." *Wright v. Doe d. Tatham, supra,* 7 Adol. & El. at 383–84, 112 Eng. Rep. at 515. He noted that, although the letters would be admissible to show that they were sent, the contents of the letters were not admissible as "evidence of the fact to be proved upon the issue—that is, the actual existence of the qualities which the testator is, in those letters, by implication, stated to possess." *Id.* at 383, 112 Eng. Rep. at 515. For that purpose, he concluded, the letters "are mere hearsay evidence, statements of the writers, not on oath, of the truth of the matter in question, with this addition, that they have acted upon the statements on the faith of their being true, by their sending the letters to the testator." *Id.* at 386–87, 112 Eng. Rep. at 515. He rejected the notion that the act of sending the letters overcame the hearsay problem.[4]

---

4. Inconsistently with his challenge to the three letters, Tatham offered testimony, which was admitted, that Marsden was treated as a child by his servants and that in his youth he was called "Silly Jack" and "Silly

As noted, the case then proceeded on writ of error to the House of Lords, which requested the opinions of seventeen judges, among whom were Baron Parke, Baron Gurney, and Justice Coleridge, who thus ended up reviewing their own decisions. Nineteenth Century English law permitted that practice; Maryland law obviously does not. In his opinion to the House of Lords, Parke essentially repeated what he had said for the Exchequer Chamber.

In *Waters v. Waters*, 35 Md. 531 (1872), the Court of Appeals cited *Wright*—in particular Baron Parke's opinion for the Exchequer Chamber—with approval and held, as the *Wright* court had, that letters written to a testator that made no direct assertion of any kind regarding the testator's competence were inadmissible to prove the competence of the testator. The Court held generally that "the acts and sayings of third persons with reference to [the testator], even though they may be construed into an expression on their part of an opinion or belief touching his mental capacity, cannot be admitted in evidence; unless connected with some act on his part which indicates his competency or incompetency." *Id.* at 544. The Court added:

> "[L]etters of third persons addressed to a party, are not of themselves any evidence of the mental capacity of the party to whom they are addressed; and are not admissible for that purpose, unless it be shown that they came to him, and that he exercised some act of judgment or understanding upon them; and then they are admissible merely as inducement, or as connected with the acts of the party, whose competency or mental capacity is in dispute, and which the letters may serve to elucidate or explain. *It is what he has*

---

Marsden." A witness was allowed to testify that he had seen boys throwing dirt at him and shouting, "There goes crazy Marsden." The court seemed to find no fault with those express or implied assertions, offered to show that Marsden was incompetent and thus constituting no less hearsay than the three letters.

*done or said upon the occasion, and not what has been done or said by others, that is pertinent to the question in issue.*"

*Id.* (Emphasis added).

Although that statement is much more indicative of a ruling on relevance than on the hearsay rule—indeed, the word "hearsay" is never mentioned in the opinion—the case, probably because of its reliance on *Wright,* has come to be regarded as a hearsay case, as establishing that statements or conduct offered as an implied assertion of some different fact not plain from the statement or conduct itself is hearsay if offered for the truth of the implied assertion. The hearsay nature of the Court's holding, like that in *Wright,* would seem to result only from this analysis:

(1) The letters themselves—their content—say nothing about the competence of the testator. They do not assert that the testator was either competent or incompetent or that he had any mental acuity or defect from which competence or incompetence could be directly inferred, and thus have no direct relevance to the issue of the testator's competence. As the contents of the letters were not offered, directly, for their truth, the hearsay rule would not be applicable; the only ground of objection to admissibility of the contents of the letters would be relevance.

(2) The only conceivable relevance of the letters would come not from the truth of the matters asserted in them but rather from an implied assertion drawn from a chain of inferences arising from the fact that such letters were written to the testator. That chain consists of the following links:

(a) An assumption that the letters conveyed a message that would be meaningless to the testator unless he was competent to understand the message;

(b) From that assumption, an inference (first inference) could be drawn that the authors of the letters *believed* that the testator was competent to understand the message;

(c) From that first inference, a second inference could be drawn that, if the authors *believed* that the testator was

competent to understand the message, he was, *in fact*, competent to understand the message;

(d) From the second inference, the ultimate (third) inference could be drawn that, if the testator was competent to understand that message, he was competent as well to make a Will.

There is, of course, some play in each of these inferences; one does not necessarily follow from the one before it. The first inference, for example—belief in the recipient's competence—assumes the good faith of the author, that he would not be inclined to taunt or tease the recipient by sending a message that he knew the recipient would not likely understand. As to the second inference, there is always the prospect that the author may have overestimated the recipient's ability to understand the message, *e.g.*, delivering to most anyone over 40 a 30–page manual on how to set up, program, and operate nearly any electronic device. The third inference is perhaps the most tenuous, especially on the facts in *Wright*, where the letters were sent between 23 and 36 years before the Will was drawn (and 26 to 39 years before the Codicil). The validity of these inferences would seem to depend, to a large extent, on what is known about the declarant and his relationship to the recipient. The less that is known (or sometimes the more that is known), the weaker become the inferences, and, because the ultimate result rests on a chain of the inferences, the weakness factor multiplies as one proceeds along the chain.[5]

To the extent there was a legitimate hearsay issue in *Waters* (or in *Wright*), it arose only from the ultimate inference—an implied assertion by an out-of-court declarant, the reliability of which depended on the credibility of that declarant, that the testator was competent to make a Will. As noted, the *Waters* Court did not go into any hearsay analysis or expound any view regarding implied assertions. It did not

---

5.  If, for example, the reliability of each inference is only 70% (and the reliability of the final inference is arguably far less than that), the reliability of the ultimate inference would be only 34.3%.

address any question of whether an implied assertion sought to be admitted for its truth could arise from conduct or words that were not intended by the declarant to assert the fact sought to be proved. Whether the declarant intended to assert anything regarding the testator's competence was simply not considered. The Court merely held that a third party's assumed belief or assertion, express or implied, that a testator was competent was not admissible to prove such competence unless the testator took some action in response or with regard to the assertion, in which event the assertion would be admissible solely to explain the testator's reaction.

Analyzed in this way, it would seem that any hearsay issue that hinges on an *implied* assertion would arise *only* if the declarant intended what he said or did to constitute such an assertion or if the trier of fact would be required, in considering the evidence, to assume such an intent, whether or not it was alleged or shown. If there was no such expressed or necessarily assumed intent—if, in the *Wright* and *Waters* context, the declarant did *not* intend his act or words to convey anything regarding the testator's competence and there was no basis for a trier of fact to assume such an intent—the act done or words uttered would be inadmissible not because they constituted an implied assertion but because they would be irrelevant; they would not make the fact of the testator's competence either more or less likely. The act or words would be relevant *only* if they were intended by the actor, or assumed to be intended by the actor, as an assertion with regard to the testator's competence, and *only* in that situation, if the assertion were offered for its truth, would the hearsay rule be applicable.

Unfortunately, *Wright v. Doe* and *Waters v. Waters* have not been construed as drawing this distinction and instead have been interpreted as holding verbal and non-verbal conduct that conceivably *could be* regarded as an implied assertion to be one, without regard to whether the actor intended his or her conduct to constitute such an assertion. If the relevant inference *could* be drawn from the conduct, it did not matter whether the actor intended that such an inference be

drawn, or, indeed, whether the actor actually held a completely opposite view. Evidence of the conduct was inadmissible because the imputed inference constituted, by legal fiat, an out-of-court assertion offered for its truth.

That rigid and illogical rule held sway in the 19th Century, but, as with other formalized rules of evidence restricting the scope of information available to judges and juries, it began to undergo challenge in the 20th Century.[6] As noted by Dean Mason Ladd in his article, *A Modern Code of Evidence*, appended to the American Law Institute's MODEL CODE OF EVIDENCE (1942), "[e]arlier fallacies have been exposed, rules of evidence have been critically examined and are being tested upon the basis of logic, psychology, and trial experience. The realistic function of evidence in the solution of controversies of fact, rather than principles in the abstract, is becoming the basis of judging evidence rules." *Id.* at 334. That change was noted as well by Justice Sutherland in *Funk v. United States*, 290 U.S. 371, 381, 54 S.Ct. 212, 215, 78 L.Ed. 369, 375 (1933): since experience "is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule."

---

**6.** Professor Maguire, no fan of *Wright*, observed that the English court missed "an almost miraculously appointed opportunity for authoritative determination of the claim that where there is no intentional communication of the proposition at issue, where that proposition is come at only by inference, there can be no hearsay." John M. Maguire, *The Hearsay System: Around and Through the Thicket*, 14 Vand. L.Rev. 741, 752 (1960–61). The missed opportunity he attributes to the legal culture in England at the time:

"The 1830's, during which the case was presented, fell in an era of somewhat pompous professional satisfaction as to the technical English rules of proof at common law. Consider, for instance, that Mr. Justice Coleridge in the instant litigation saw fit to decry before the House of Lords 'the *fallacy*, that, whatever is morally convincing, and whatever reasonable beings would form their judgments and act upon, may be submitted to a jury.' [citation omitted], Liberalized reception of evidence, by definition or otherwise, was scarcely the order of the day."

*Id.* at 753. (Emphasis added).

An early inroad on the notion that an actor's intent is irrelevant in determining whether out-of-court conduct may be treated as an implied assertion came with the development of the Model Rules of Evidence by the American Law Institute in 1942. In § 501, the Model Code defined "hearsay evidence" as "evidence of a hearsay statement or of a hearsay declaration." Both of those terms were also defined and both required that there be a "statement." Section 501(1) defined a "statement" as including "both conduct found by the judge to have been intended by the person making the statement to operate as an assertion by him and conduct of which evidence is offered for a purpose requiring an assumption that it was so intended." That precept was carried forth in the definition of "hearsay statement" in § 501(2), that a hearsay statement was "a statement of which evidence is offered as tending to prove the truth of the matter *intended to be asserted or assumed to be so intended ...*" (Emphasis added).

That approach made the intent on the part of the actor the linchpin: the out-of-court conduct would not constitute an implied assertion unless either the court found that the actor intended such an assertion or the evidence was offered for a purpose requiring an assumption that it was so intended. In the absence of such an intent, the evidence may be inadmissible because of a lack of relevance, but not because it was hearsay.

Although the development and publication of the Model Code served to focus attention on the shortcomings of *Wright v. Tatham,* the Code itself was not adopted in any of the States, so the criticism of the English decision remained largely in the commentary, where it abounded. *See,* for example, John Maguire, *The Hearsay System: Around and Through the Thicket, supra,* 14 Vand. L.Rev. 741; Ted Finman, *Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence,* 14 Stan. L.Rev. 682 (1961–62); Judson Falknor, *The "Hear–Say" Rule as a "See–Do" Rule: Evidence of Conduct,* 33 Rocky Mtn. L.Rev. 133 (1960–61).

In 1961, the United States Judicial Conference approved a proposal to develop a comprehensive Federal Code of Evidence, and it was that effort that ultimately led to the rejection by most of the Federal and State courts of the conclusion espoused by Baron Parke in *Wright.* Pursuant to its authority under the Federal Rules Enabling Act (28 U.S.C. § 2072) to prescribe rules of evidence for the U.S. District Courts, the Supreme Court appointed a special Advisory Committee on Rules of Evidence to draft such a Code.

The Advisory Committee dealt with the implied assertion issue through the definition of "hearsay," and, in particular, through the definition of "statement." [7] An early draft of FRE 801(a) stated that "conduct of a person, either verbal or non-verbal, is not a statement unless intended by him as an assertion." *See* Minutes of Fourteenth Meeting of Advisory Committee, May 23–25, 1968 at 30. That articulation made absolutely clear that *no* conduct was to be regarded as a statement, and thus as hearsay, unless intended, by the person whose conduct it was, to be an assertion. In order to state that proposition in the affirmative, rather than the negative, however, the draft was amended to define "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person if, *but only if, it is intended by him as an assertion.*" (Emphasis added). *Id.* at 33. That language was consistent with, though not identical to, the then-recently adopted California Evidence Code, which defined "statement" as "(a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." CAL. EVID.CODE § 225 (1967).

---

7. The definition of "statement" is critical to the Federal Rule on hearsay. The term "hearsay" is defined in FRE 801(c) as *"a statement,* other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (Emphasis added). "Declarant" is defined as "a person who makes a statement." FRE 801(b). If the evidence does not constitute a "statement," it cannot be hearsay and the source of the evidence is not a declarant.

The change in language provoked questions from Advisory Committee members as to whether limiting proposed Rule 801(a)(2) to "nonverbal" conduct might imply that section (a)(1) was limited to verbal expressions. The Reporter responded that "oral statements had to be considered as conduct, too," and, after some further discussion, the revised language was approved. *See* Minutes of Fourteenth Meeting of Advisory Committee, *supra*, at 32. That textual language survived further review by the Advisory Committee, the Standing Committee on Rules of Practice and Procedure, the Supreme Court, and Congress.

Perhaps to clarify that the revision of the language from the early draft was not intended to treat verbal conduct differently from non-verbal conduct for purposes of the hearsay rule, the Advisory Committee attached a lengthy Committee Note to the text of FRE 801. The opening paragraph of that Committee Note states:

> "The definition of 'statement' assumes importance because the term is used in the definition of hearsay in subdivision (c). *The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. The key to the definition is that nothing is an assertion unless intended to be one.*"

(Emphasis added).

It is clear from the remainder of the Advisory Committee Note that, in addressing implied assertions—assertions based on conduct—the Committee conceived that such implied assertions could, indeed, emanate, at least in part, from words uttered, but it concluded (as ultimately did the Supreme Court and Congress) that, even if such conduct could be regarded as assertive in nature, evidence of it should not be excluded under the hearsay rule. The full text of the Committee Note needs to be considered to understand the rationale:

> "It can scarcely be doubted that an assertion made in words is intended by the declarant to be an assertion. Hence verbal assertions readily fall into the category of 'state-

ment.' Whether nonverbal conduct should be regarded as a statement for purposes of defining hearsay requires further consideration. Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement. Other nonverbal conduct, however, may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred. This sequence is, arguably, in effect an assertion of the existence of the condition and hence properly includable within the hearsay concept. See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L.Rev. 177, 214, 217 (1948), and the elaboration in Finman, Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence, 14 Stan. L.Rev. 682 (1962). Admittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, *but the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds.* No class of evidence is free of the possibility of fabrication, but the likelihood is less with nonverbal than with assertive verbal conduct. The situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reliance will bear heavily upon the weight to be given the evidence. Falknor, The 'Hear–Say' Rule as a 'See–Do' Rule: Evidence of Conduct, 33 Rocky Mt. L.Rev. 133 (1961). *Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded from the definition of hearsay by the language of subdivision (c).*

*When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an*

*assertion is intended. The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility.* The determination involves no greater difficulty than many other preliminary questions of fact. Maguire, The Hearsay System: Around and Through the Thicket, 14 Vand. L.Rev. 741, 765–767 (1961). For similar approaches, see Uniform Rule 62(1); California Evidence Code §§ 225, 1200; Kansas Code of Civil Procedure § 60–459(a); New Jersey Evidence Rule 62(1)."

(Emphasis added).

The adoption of FRE 801 marked a sea change in the perception of implied assertions. The great majority of courts that have considered the issue and most of the recognized commentators now agree that a person's conduct, whether verbal or non-verbal, will not constitute a statement for purposes of the hearsay rule unless the person intended his or her conduct to assert the matter sought to be admitted for its truth.

Turning first to the commentators, some of whom were involved in the development of the Federal Rules of Evidence, Saltzburg, Martin, and Capra note that "[c]onduct is not hearsay merely because it is offered to prove the truth of the belief that generated the conduct. Rather, under Rule 801, conduct can only be hearsay if the declarant *intended* by the conduct to communicate information." 4 Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, THE FEDERAL RULES OF EVIDENCE MANUAL § 801.02[1][c] at 801–14 (8th ed.2002). They point out:

"The reasons for excluding non-assertive conduct from the hearsay rule are persuasive. A principal reason for excluding hearsay is because the veracity of the declarant cannot be tested by cross-examination. In the case of non-assertive acts, the author by definition does not intend to make an assertion, meaning that the risk of insincerity is substantially diminished. The actor is at least not trying to lie. Moreover, non-assertive conduct is usually more reliable

than the ordinary out-of-court statement, because by conduct the declarant has risked action on the correctness of his belief—he has put his money where his mouth is." *Id.* at 801–15.

The fifth, and current, edition of McCormick, after raising the question of whether the letters written to Marsden, if offered as evidence of his competence, should be regarded as hearsay, notes that "the basic answer under the Federal Rules and contemporary judicial analysis is that an out-of-court assertion is not hearsay if offered as proof of something other than the matter asserted. The theory is that questions of sincerity are generally reduced when assertive conduct is 'offered as a basis for inferring something other than the matter asserted.'" (quoting from Advisory Committee Note). 2 John W. Strong, Kenneth S. Broun, George E. Dix, Edward J. Imwinkelried, D.H. Kaye, Robert P. Mosteller, and E.F. Roberts, McCormick on Evidence 111–12 (5th ed.1999). Although acknowledging that not all of the alleged hearsay dangers have been entirely eliminated, the authors point out that "the contemporary resolution of the issues involved in 'implied assertions' reflect ultimately a compromise between theory and the need for a relatively simple and workable definition in situations where hearsay dangers are generally reduced." *Id.* at 113.

Mueller and Kirkpatrick purport to see some limited lingering value in *Wright's* analysis of the so-called "two-step inference" (belief from conduct, fact from belief), but they acknowledge that "FRE 801 rejects the broad proposition endorsed by Baron Parke" and suggest that, "arguably, it would be wiser to forget *Wright* than continue to discuss it." 4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 378 at 59–60 (2nd ed.1994).

Weinstein, who was a member of the Advisory Committee, though noting that words and actions "may convey meaning even though they were not consciously intended as assertions," points out that "[a]ccording to the Advisory Committee, the 'key to the definition is that nothing is an assertion unless

it is intended to be.'" 5 Joseph M. McLaughlin, Jack B. Weinstein, and Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 801.10[2][c] at 801–10 (2nd ed.2005).

David Binder also confirms that the broad concept of hearsay emanating from *Wright* is inconsistent with the definition adopted in the Federal Rules and "would encompass much of what is now considered circumstantial evidence, and there would be no end to what might be considered hearsay." David F. Binder, HEARSAY HANDBOOK § 1.10 at 1–17 (4th ed.2001).

Some academics have challenged the wisdom of the decision by the Advisory Committee, the Supreme Court, and Congress to exclude implied assertions from the definition of hearsay and would like to return to their perception of the common law rule. In 1997, a proposal was made by Professor Paul Rice and his staff at American University Washington College of Law to achieve that result by rewriting FRE 801(a) to define "statement" as "all speech and writing, as well as any action that communicates a message." *See The Evidence Project,* 171 F.R.D. 330, 362, 596–97 (1997). It does not appear that Professor Rice's proposal has received any serious attention by the Federal Judiciary. The Supreme Court seems quite content with the Rules as they are, as it has rejected occasional calls by Rice and others for it to appoint a new Advisory Committee to review those rules.

The Majority suggests that the Advisory Committee Note has been "the source of disagreement in the courts and among scholars," and posits that "some Federal courts" construe FRE 801(a) in accord with the Note, while "other courts" do not. It cites only cases from the Third Circuit Court of Appeals and *Lyle v. Koehler,* 720 F.2d 426 (6th Cir.1983) from the Sixth Circuit, as evidencing the courts that do not.

The suggestion that there is anything approaching an equal division among the courts is misleading. Apart from the fact that both the Third and Sixth Circuit courts may have altered

their view since the cases relied on by the Majority,[8] all of the other Federal appellate courts that have considered the matter—the Second, Fourth, Fifth, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits—have held unintended "assertions" implied from verbal or non-verbal conduct not to constitute statements for purposes of the hearsay rule. *See Headley v. Tilghman,* 53 F.3d 472, 477 (2nd Cir.1995), *cert. denied,* 516 U.S. 877, 116 S.Ct. 207, 133 L.Ed.2d 140 (1995); *United States v. Oguns,* 921 F.2d 442, 448–49 (2nd Cir.1990); *United States v. Giraldo,* 822 F.2d 205, 212–13 (2nd Cir.1987), *cert. denied,* 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987); *United States v. Lis,* 120 F.3d 28 (4th Cir.1997); *United States v. Weeks,* 919 F.2d 248, 251–52 (5th Cir.1990), *cert. denied,* 499 U.S. 954, 111 S.Ct. 1430, 113 L.Ed.2d 481 (1991) ("According to the drafters of the Federal Rules of Evidence, the 'key' to the definition of 'statement' is that 'nothing is an assertion unless intended to be one.'"); *United States v. Lewis,* 902 F.2d 1176, 1179 (5th Cir.1990) ("Rule 801, through its definition of statement, forecloses appellant's argument by removing implied assertions from the coverage of the hearsay rule"); *United States v. Singer,* 687 F.2d 1135, 1147 (8th Cir.1982) (en banc); *United States v. Perez,* 658 F.2d 654, 659 (9th Cir. 1981); *United States v. Jackson,* 88 F.3d 845, 847–48 (10th Cir.1996); *United States v. Summers,* 414 F.3d 1287 (10th Cir.2005) (recognizing Rule, but finding that assertion was intended); *United States v. Groce,* 682 F.2d 1359, 1364 (11th Cir.1982); *United States v. Long,* 905 F.2d 1572, 1579 (D.C.Cir.1990), *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112

---

**8.** *See Lexington Insurance Co. v. Western Pennsylvania Hospital,* 423 F.3d 318, 330 (3rd Cir.2005) (following Advisory Committee Note that "nothing is an assertion unless intended to be one"). *See also United States v. Short,* 790 F.2d 464 (6th Cir.1986) (testimony by social worker regarding behavior of three-year-old child while playing with anatomically correct doll admissible as non-hearsay to support inference that child had knowledge of oral sex); *also United States v. Dandy,* 998 F.2d 1344 (6th Cir.1993), *cert. denied,* 510 U.S. 1163, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994); *United States v. Wright,* 343 F.3d 849, 865–66 (6th Cir.2003), *cert. denied,* 541 U.S. 990, 124 S.Ct. 2016, 158 L.Ed.2d 496 (2004).

L.Ed.2d 328 (1990); *United States v. Zenni,* 492 F.Supp. 464 (E.D.Ky.1980); *Gaw v. C.I.R.,* 70 T.C.M. (CCH) 1196 (1995).

That is true with respect to the State courts as well. The Majority cites cases from Iowa, Texas, and Virginia, but fails to mention either that the Texas ruling is based on a statute or contrary rulings consistent with the Federal approach in Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Indiana, Michigan, Missouri, New Mexico, Tennessee, Washington, Wisconsin, and Wyoming. *See State v. Carrillo,* 156 Ariz. 120, 750 P.2d 878, 882 (App.1987), *modified on other grounds,* 156 Ariz. 125, 750 P.2d 883 (1988); *People v. Morgan,* 125 Cal.App.4th 935, 23 Cal.Rptr.3d 224 (Cal.App.2005); *People v. Griffin,* 985 P.2d 15, 17–18 (Colo. App.1998) (acknowledging the rule but holding that evidence in question did not fall within it); *State v. Esposito,* 223 Conn. 299, 613 A.2d 242, 251 (1992); *Little v. United States,* 613 A.2d 880, 881–82 (D.C.1992); *Burgess v. United States,* 608 A.2d 733, 739 (D.C.1992); *Hernandez v. State,* 863 So.2d 484 (Fla. App.2004), *review denied,* 874 So.2d 1191 (Fla.2004); *Bustamante v. State,* 557 N.E.2d 1313 (Ind.1990); *People v. Jones,* 228 Mich.App. 191, 579 N.W.2d 82, 93 (1998) *(On Reh. Aft. Remand ), review of hearsay issue denied,* 458 Mich. 862, 587 N.W.2d 637 (1999) ("[W]e should not be surprised that the vast majority of cases decided under the Federal Rules of Evidence and their state counterparts that have addressed the issue have rejected the 'implied assertion' theory"); *State v. Williams,* 118 S.W.3d 308, 311–12 (Mo.App.2003); *Jim v. Budd,* 107 N.M. 489, 760 P.2d 782 (1987), *cert. denied,* 106 N.M. 95, 739 P.2d 509 (1987); *State v. Ortiz–Burciaga,* 128 N.M. 382, 993 P.2d 96, 101 (Ct.App.1999); *State v. Land,* 34 S.W.3d 516 (Tenn.Crim.App.2000) (recognizing rule but holding evidence intended as an assertion); *State v. Collins,* 76 Wash.App. 496, 886 P.2d 243 (1995), *review denied,* 126 Wash.2d 1016, 894 P.2d 565 (1995); *State v. Kutz,* 267 Wis.2d 531, 671 N.W.2d 660, 675–76 (App.2003), *review denied,* 269 Wis.2d 198, 675 N.W.2d 804 (2004); *Guerra v. State,* 897 P.2d 447, 459–62 (Wyo.1995).

Before turning to Maryland, it may be of interest to note that Baron Parke's views expressed in *Wright*—the spawner of the doctrine so soundly rejected in current American law— have not been followed in some of the British Commonwealth countries and, if it had a free hand to do so, would probably have been overruled by the House of Lords in England. The holding in *Wright* came before the House of Lords in *Regina v. Kearley* [1992] 2 A.C. 228. The police raided the home of the defendant and found some drugs inside, but not enough clearly to indicate that they were for distribution rather than personal use. While at the defendant's home, the police answered a number of telephone calls in which the callers asked to speak with the defendant and to be supplied with drugs by him. The trial court allowed the officers to testify about those calls, and the defendant was convicted of possession with intent to supply. The Court of Appeals affirmed, and the question was certified to the House of Lords "whether evidence may be adduced at a trial of words spoken ... by a person not called as a witness, for the purpose not of establishing the truth of any fact narrated by the words, but of inviting the jury to draw an inference from the fact that the words were spoken (namely that the defendant was a supplier of drugs)." *Id.* at 230.[9]

The five judges assigned to hear the case recognized the precedent of *Wright*, and split three-to-two to entertain the appeal and reverse. The opinions of the judges, in this instance, are more significant than the effect of their decision, as at least three of the five—the two dissenters and one in the majority—concluded that *Wright* was not consistent with modern practice and ought to be at least reconsidered, if not overruled. The only stumbling block, for at least one in the majority, was a 1965 decision of the House of Lords, *Myers v. Director of Public Prosecutions* [1965] A.C. 1001; [1964] 3

---

9. The fact that the question was cast in the singular—one call—caused some problem for the judges on the issue of relevance. Several believed that, although one call would have been irrelevant, several calls did have relevance on the issue of whether the drugs possessed by the defendant were for distribution.

W.L.R. 145; [1964] 2 All E.R. 881. H.L. (E.) in which the House of Lords determined (also by a three-to-two vote) that any further development of or changes to the hearsay rule should be made by Parliament and not judicially. That precluded the House, acting as a judicial body, from overruling *Wright.*

The dissenters in *Kearley* were direct in their criticism of *Wright.* Lord Griffiths commented:

"Unless compelled to do so by authority I should be most unwilling to hold that such evidence should be withheld from the jury. In my view the criminal law of evidence should be developed along common sense lines readily comprehensible to the men and women who comprise the jury and bear the responsibility for the major decisions in criminal cases. I believe that most laymen if told that the criminal law of evidence forbade them even to consider such evidence as we are debating in this appeal would reply 'Then the law is an ass.'"

*Id.* at 236–37.

After analyzing a number of cases from Commonwealth countries and the decision of the Privy Council in *Ratten v. The Queen* [1972] A.C. 378, Lord Griffiths announced that he would be prepared to answer the certified question in the affirmative. *Id.* at 242.[10] Lord Browne–Wilkinson agreed.

---

**10.** In *Ratten*, the defendant, charged with shooting and killing his wife, claimed that the shotgun discharged while he was cleaning it. A telephone operator was allowed to testify that, shortly before the time of the shooting, she received a call from the defendant's home and that the call was from a woman who, sobbing and hysterical, said, "Get me the police, please" and gave her address but hung up before the operator could contact the police. Lord Wilberforce, for the Privy Council, held that the contents of the call were not hearsay. Recounting that case, Lord Griffiths concluded that the words spoken "were relevant to show that the wife in a hysterical state wanted the police from which the jury could draw the inference that her death shortly thereafterwards from gunshot wounds was not an accident." He added, "It seems to me inevitable that the jury must also have drawn the inference that she was terrified and wanted the police because she believed her husband might shoot her. But this possible inference was not sufficient to exclude the evidence as hearsay."

Indeed, after considering the relevant part of Baron Parke's opinion, he concluded, "in my judgment the opening words of that passage show that Parke B. would have adopted the same view as the Privy Council in *Ratten v. The Queen* ... if the sending of a letter and its contents had itself been a circumstantial fact from which an inference (other than an inference as to the writer's opinion) could be drawn." *Regina v. Kearley, supra,* 2 A.C. at 285. Browne–Wilkinson said that he "can find no reason why the evidence of multiple calls should not have been admitted" and that he would have dismissed the appeal. *Id.* at 287. He urged Parliament to review the hearsay rule, as "[i]n cases such as the present it hampers effective prosecution by excluding evidence which your Lordships all agree is highly probative and, since it comes from the unprompted actions of the callers, is very creditworthy."

As in most cases, it is the views of the majority, not the dissent, that are most significant. Lord Bridge of Harwich, one of the three in the majority, after recounting the demise of *Wright* in the United States, stated that he "fully appreciate[d] the cogency of the reasons advanced in favour of a limitation or exception to the operation of the hearsay rule which would allow the admission of implied assertions of the kind in question," but concluded that, in light of *Myers v. Director of Public Prosecutions, supra* [1965] A.C. 1001, it was not "open to your Lordships to modify judicially the common law rule as expounded in *Wright v. Doe d. Tatham.* ..." *Id.* at 249. "However strong the temptation to legislate judicially in favor of what is seen as a 'common sense' result and however tardy Parliament may appear to be in reforming an area of law which is seen to be in need of radical reform," he added, it was for Parliament to make the change. *Id.* at 251.

Only Lord Ackner and Lord Oliver of Aylmerton seemed actually to agree with Parke's view in *Wright,* although Lord Ackner did note that "if a convincing case can be made out for relaxing the hearsay rule's application to the type of situation which has arisen in this appeal, then it must be achieved by legislation." *Id.* at 258. A fair analysis of the five opinions more than suggests that, but for the governing mandate that

any overruling of *Wright* would have to be done by Parliament, Lord Bridge of Harwick would have joined the two dissenters and *Wright* would have ceased to be the law in England.

The debate over how to treat implied assertions arises mostly from the large universe of conduct that conceivably could produce an implied assertion, the debate often focusing on whether the conduct in question was, itself, "assertive." In some situations, the answer is easy—the nodding or shaking of the head in response to a question, pointing a finger at a suspect, showing four fingers when asked how many shots were fired. That kind of conduct is routinely held to be assertive because, absent some extraordinary circumstance, the court can reliably assume that it was intended by the actor to be an assertion—the functional equivalent of an oral response that would clearly constitute a statement for hearsay purposes.

Other conduct is more ambiguous. Courts, including the trial court in this case, have wrestled over whether a question can constitute an assertion, whether there is any truth or falsity that can be found in a question, and have come to different conclusions. Judges and commentators have raised and discussed dozens of hypotheticals—whether the action of a sea captain who, after inspecting a ship, allows his family to travel on the ship constitutes an implied assertion that the ship is seaworthy, and what, if any, assertion may be implied from the act of a suspect, or a non-suspect, in fleeing during the pendency of an investigation. The notion of implied assertions has become entwined with the state of mind exception to the hearsay rule, with the broader concept of circumstantial evidence from which inferences can be drawn, and with the equally broad issue of relevance, and the ultimate ruling on admissibility can depend on the analytical method chosen by the court to address the issue.

All of this weighed heavily on this Court's Standing Committee on Rules of Practice and Procedure when drafting the Maryland Rules of Evidence, and particularly Rule 5–801.

Rule 5–801(a), defining "statement" for purposes of the hearsay rules, is identical to FRE 801. The Court's Rules Committee was, of course, well aware of the Federal Rule and the Advisory Committee Note. The Reporter's Note attached to Rule 5–801 in the Committee's 125th Report to the Court noted that §§ (a) and (b) of the Rule tracked their Federal counterparts.

The Reporter's Note added that the Committee "considered whether to define 'assertion' but concluded that this was best left to case law development." Given the differing views regarding the kinds of verbal or non-verbal conduct that might constitute an assertion, the Reporter's Note recited the Committee's concern that "the form of a particular statement not be determinative of whether it is an 'assertion' for purposes of this Rule" and observed that "[t]his is a particular problem with questions and is a point upon which the decisions are not harmonious." In that regard, the Committee suggested, and the Court, in adopting the Committee's draft of Rule 5–801(a), approved, the following Committee Note:

"This Rule does not attempt to define 'assertion,' a concept best left to development in the case law. The fact that proffered evidence is in the form of a question or something other than a narrative statement, however, does not necessarily preclude its being an assertion. Nor does the Rule attempt to define when an assertion, such as a verbal act, is offered for something other than its truth."

A fair inference may be drawn from the Committee Note that the Court did not intend, merely by adopting the language of FRE 801(a), to make any determination as to the continued vitality of *Waters v. Waters.* Compare Committee Notes to Rule 5–607 ("This Rule eliminates the common law 'voucher' rule") and Rule 5–702 ("This Rule is not intended to overrule *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978) and other cases adopting the principles enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)") in which the Court *did* indicate an intended effect, or non-effect, of the Rule on current common law. The Court was aware of the Federal courts' view of the effect of FRE 801(a), however, and was

aware as well that approximately 38 States had, by then, adopted codes of evidence similar or identical to the Federal rules. The Court understood, because the point was stressed in the presentation of the Committee's Report, that one of the important reasons to adopt a Code of Evidence modeled closely on the Federal Rules of Evidence was to have a national Federal and State case law research base to guide the future development and interpretation of Maryland's evidence law.

In that light, it makes no sense to reject the overwhelmingly predominant view of both the Federal and State courts—the national case law base—that the doctrine emanating from *Wright v. Doe*, flawed from its inception, has no present force and that "the effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence, verbal or nonverbal, not intended as an assertion." To hold on to the rigid formulation of one English judge espoused in an 1837 case that, in Maryland, would never have proceeded to the point that it did, and thereby put, or keep, Maryland out of step with most of the rest of the country on a point of law that should be uniform, is neither logical nor practical. The validity of what is attributed to *Wright* has been fairly debated by courts and commentators over many decades, and a broad consensus verdict has been returned. This Court should not just accept, but embrace, that verdict. *Waters* should be overruled.[11]

*Legitimate Reasons Why The Testimony Was Inadmissible*

As noted, there are two adequate reasons why Jasmine's question, sought to be admitted through the testimony of her

---

11. In an attempt to defend its indefensible position, the Court complains that we have "faile[d] to address the policy considerations the majority opinion has advanced" (footnote 7) and that our position "would be difficult to apply in practice" (footnote 8). That is not the case. If the Court would read again the cases and commentary cited throughout this Concurring Opinion, it would find that the overwhelming majority view is that the "policy considerations" advanced by the majority are simply not shared by most other authorities. As to "practicality," the rest of the country has had no problem implementing the modern approach.

mother, was inadmissible: it *did* constitute hearsay, for which no exception was available; and it emanated from a declarant who likely would have been incompetent as a witness.

Rejection of *Wright* and *Waters* does not necessarily exclude implied assertions from the operation of the hearsay rule. It simply means that a court may not treat as a statement, for purposes of the hearsay rule, an alleged assertion that rests solely on an implication from verbal or non-verbal conduct unless the actor either intended that such an assertion arise from his or her conduct or that such an intent is necessary to the relevance of the evidence. If the court finds from the circumstances that the actor intended his or her out-of-court conduct to imply the proffered assertion or that the relevance of the evidence hinges on an assumption of that intent, the implied assertion *does* constitute a statement, and if that statement is offered for its truth, it constitutes hearsay. That, indeed, is precisely the case here.

Jasmine's question, whether Erik will "get" her, has no direct relevance to whether Stoddard murdered Calen, and it was not offered as having such relevance. It was offered, in conjunction with the evidence of the behavioral changes, to show that Jasmine was afraid that Stoddard *might* "get" her, but the relevance of even that inference is, at best, dubious.

The true, and only relevant, purpose for admitting the question was to show that there was a basis for the child's fear, and that the basis was her observation of what Stoddard had done to Calen. The prosecutor made that clear. In this circumstance, however, given that Jennifer had not discussed the matter with the child, that purpose would necessarily require the jury to assume that Jasmine had not only, in fact, observed that occurrence but that her fearful question was intended, even if implicitly, to convey that fact to her mother. If that intent was not to be assumed, the question had no relevance. Because the assertive nature of the question was most likely intended by the child but, in any event, had to be assumed for the evidence to be relevant, it *did* constitute a statement that was being offered for its truth and therefore

constituted hearsay. As it fell within no exception, it was inadmissible hearsay.

Maryland Rule 5–601 creates a presumption that every person, including a child, is competent to be a witness. Maryland Code, § 9–103 of the Cts. & Jud. Proc. Article supplements the Rule with the statutory provision that, in a criminal trial, "the age of a child may not be the reason for precluding a child from testifying." Although the Rule and the statute preclude a categorical finding of incompetence based on age, they do not remove the discretion of the trial court, upon a challenge, to determine whether a particular child witness is, in fact, competent to testify.

In *Perry v. State,* 381 Md. 138, 148–49, 848 A.2d 631, 637 (2004), we observed that the test for determining the competence of a child witness is not age but rather " 'whether the witness has intelligence enough to make it worthwhile to hear him [or her] at all and whether he [or she] feels a duty to tell the truth.' " (quoting from *Brandau v. Webster,* 39 Md.App. 99, 104, 382 A.2d 1103, 1106 (1978)). Quoting then from *Jones v. State,* 68 Md.App. 162, 166–67, 510 A.2d 1091, 1094 (1986), we noted that "[t]he trial court must determine the child's 'capacity to observe, understand, recall, and relate happenings while conscious of a duty to speak the truth.' " We adopted as the test for a child's competency the factors set forth in 2 Barbara E. Bergman and Nancy Hollander, WHARTON'S CRIMINAL EVIDENCE § 7:16 (15th ed.1998):

> "[I]ntelligence; an understanding of the obligation to tell the truth; knowledge of the nature of an oath; ability at the time of the occurrence to accurately perceive it; ability to remember the occurrence; capacity to actively communicate the memories; and ability to understand and respond to simple questions about the occurrence. It is not necessary that the child be able to define an oath. The child need only understand that, upon taking an oath, the child has promised to tell the truth."

When a facially valid challenge is presented, the court must make some inquiry, sufficient to allow it to determine whether

the witness, including a child witness, is competent. *Perry*, at 146–47, 848 A.2d at 636, citing *United States v. Odom*, 736 F.2d 104 (4th Cir.1984) and *United States v. Gerry*, 515 F.2d 130 (2d Cir.1975), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

Although there is no pre-fixed minimum age for competency, the issue will necessarily arise with respect to infants and toddlers, whose capacity to meet the test may be inherently suspect. We are aware of no case in which a two-year-old child has been found competent to testify as to positive assertions that would constitute statements for purposes of the hearsay rule, and, indeed, there is considerable psychological evidence that children of such tender age lack the ability to distinguish meaningfully between truth and lies. *See* Jean Piaget, THE MORAL JUDGMENT OF THE CHILD (1965); Lawrence Kohlberg & Elliot Turiel, *Moral Development and Moral Education, in* PSYCHOLOGY AND EDUCATIONAL PRACTICE (G. Lesser ed., 1971); J.G. Smetana & J.L. Braeges, *The Development of Toddler's Moral and Conventional Judgments*, 36 Merrill–Palmer Quarterly 329 (1990); Laura E. Berk, CHILD DEVELOPMENT 475 (4th ed.1997); Roger V. Burton & Abigail F. Strichartz, *Children on the Stand: The Obligation to Speak the Truth*, 12 DEVELOPMENTAL & BEHAVIORAL PEDIATRICS 121, 123 (1991).

Had Jasmine been called as a witness to testify to what she may have observed, her competence would surely have been challenged, and the trial court would have been required to conduct a reasonable inquiry in order to determine the issue. We certainly can express a healthy skepticism whether the two-year-old child would have been permitted to testify under oath to events she witnessed when she was eighteen months old. Notwithstanding Stoddard's objection to the reliability of the hearsay statement attributed to Jasmine, no such inquiry was made.

The question is then raised whether, if Jasmine herself would have been precluded from testifying as to what she observed, an out-of-court implied assertion that she saw Stod-

dard harm Calen can be admitted through the testimony of her mother. Does the repetition of the statement by the mother give it any greater reliability? The answer has to be "no."

It is important to note that we are not dealing here with an excited utterance or other spontaneous statement, the reliability and admissibility of which rests upon its spontaneity. The incompetence of the declarant in that situation has not been regarded as an impediment. *See Moore v. State,* 26 Md.App. 556, 561–62, 338 A.2d 344, 347 (1975), *cert. denied,* 276 Md. 747 (1975) (excited utterance of three-and-a-half year old admitted); *Jackson v. State,* 31 Md.App. 332, 356 A.2d 299 (1976) (excited utterance of four-year-old admitted); *Johnson v. State,* 63 Md.App. 485, 492 A.2d 1343 (1985), *cert. denied,* 304 Md. 298, 498 A.2d 1185 (1985) (excited utterance of insane person admitted); Annotation, *Admissibility of testimony regarding spontaneous declarations made by one incompetent to testify at trial,* 15 A.L.R.4th 1043 (1982).[12]

The general rule is that out-of-court statements may not be admitted under a hearsay exception unless the declarant would have been competent to testify directly with respect to the statement. The rationale for that rule, which would seem to be self-evident, was articulated in an 1881 English case, *Dysart Peerage Case* [1881] L.R. 6 App. Cas. 489, 504, where Lord Blackburn concluded that "it is impossible that if a person said something, and could not himself, if alive, have been permitted to give testimony to prove it, he can, by dying, render that statement admissible." Wigmore elaborated:

"The hearsay rule is merely an additional test or safeguard to be applied to testimonial evidence otherwise admissible. The admission of hearsay statements, by way of exception to the rule, therefore presupposes that the assertor possessed the *qualifications of a witness* in regard to knowl-

12. Nor would Jasmine's statement qualify under Maryland Code, § 11–304 of the Criminal Procedure Article, as she was not asserted to be a "child victim" and the statement was not made to a person listed in § 11–304(c).

edge and the like. These qualifications are fundamental as rules of relevancy."

5 WIGMORE, EVIDENCE (Chadbourne rev.1974) § 1428, p. 255 (emphasis in original).

McCormick agrees: "As a general proposition, the competency standards apply to hearsay declarants as well as in-court witnesses. If a person would be incompetent to testify on the stand, his hearsay statement is usually inadmissible." 1 McCORMICK ON EVIDENCE, *supra*, § 61, n. 3 at 266–67. *See also* Clifford S. Fishman, 4 JONES ON EVIDENCE, § 28:6 at 617 (7th ed.2003) ("a witness may testify only if he or she is competent, and the same rule applies with regard to a hearsay declarant"). Most courts have also expressed that view. *See State v. Ryan,* 103 Wash.2d 165, 691 P.2d 197, 203 (1984) ("the declarant's competency is a precondition to admission of his hearsay statements as are other testimonial qualifications"); *In re Basilio T.,* 4 Cal.App.4th 155, 166, 5 Cal.Rptr.2d 450 (Cal.App.1992) ("we apply the general rule that if a declarant would have been disqualified to take the stand by reason of infancy or insanity his extrajudicial statements must also be inadmissible"), *superseded by statute as recognized by In re Lucero L.,* 22 Cal.4th 1227, 1239–42, 96 Cal.Rptr.2d 56, 998 P.2d 1019 (2000); *South Carolina Dept. of Social Services v. Doe,* 292 S.C. 211, 355 S.E.2d 543, 548 (App.1987) ("it is impossible that a child who is incompetent to make statements as a witness can, by absenting himself from court, render those statements admissible. Generally, if the declarant was not competent at the time of making the statement, it may not be admitted into evidence through hearsay repetition").

We would reverse the judgment of the Court of Special Appeals on the ground that Jennifer's repetition of Jasmine's question to her was inadmissible, for the reasons noted in this opinion. We would not, however, cling to the antiquated and largely discarded view of Baron Parke regarding implied assertions, but, on that issue, would join the rest of the country in holding that an alleged assertion implied solely from verbal or non-verbal conduct does not constitute a statement for purposes of the hearsay rule unless either the

declarant intended to make such an assertion or the admission of the evidence requires an assumption of such an intent.

Judge BATTAGLIA and Judge GREENE join in this concurring opinion.